ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

FILED
FEB 19 2008
U.S. COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TYLER CONSTRUCTION GROUP, | : | |
| Plaintiff, | : | |
| v. | : | No. 08-94 C |
| THE UNITED STATES, | : | |
| Defendant. | : | |

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION AND DECLARATORY JUDGMENT

Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Dr., Suite 100
Ft. Washington, PA 19034
215-542-2777
215-542-2779(fax)
mhp@phslegal.com

Attorney of Record for
TYLER CONSTRUCTION GROUP

OF COUNSEL:

Joseph A. Hackenbracht, Esquire
Timothy A. Sullivan, Esquire
Payne Hackenbracht & Sullivan

# TABLE OF CONTENTS

Table of Authorities ........ ii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION AND DECLARATORY RELIEF ........ 1

I. ISSUES PRESENTED ........ 1

II. STATEMENT OF THE CASE ........ 2

III. ARGUMENT ........ 5

A. Jurisdiction and Standard of Review ........ 5

B. The Use Of A Negotiated IDIQ Solicitation To Procure Open-Ended Construction Task Order Projects Violates Applicable Law And Regulation ........ 7

1. The Solicitation Violates Applicable Law And Regulation Governing IDIQ Procurement ........ 10

2. The Solicitation Illegally Bundles Multiple Construction Projects In Violation Of The Small Business Act ........ 21

3. The Solicitation Violates The Statutory Preference For Sealed Bidding In Construction Contracting ........ 25

C. The Proposed IDIQ Solicitation Is Arbitrary And Capricious ........ 28

D. Criteria For Injunctive Relief ........ 29

E. Likelihood Of Success On The Merits ........ 29

F. Plaintiff Will Suffer Irreparable Harm If Relief Is Not Granted ........ 30

G. The Balance Of Hardships Decidedly Favor Plaintiff ........ 31

H. Injunctive Relief Will Serve The Public Interest ........ 32

CONCLUSION ........ 32

# TABLE OF AUTHORITIES

Page(s)

CASES

A&D Fire Protection, Inc. v. U.S.,
72 Fed.Cl. 126 (2006) .......... 17, 19

Abatement Contracting Corp. v. United States,
58 Fed.Cl. 594 (2003) .......... 18

Bannum v. United States,
404 F.3d 1346 (Fed. Cir. 2005) .......... 6

Blue and Gold Fleet, L.P. v. United States,
492 F.3d 1308,1313 (Fed.Cir. 2007) .......... 30

Data Gen. Corp. v. Johnson,
78 F.3d 1556 (Fed.Cir.1996) .......... 30

Erinys Iraq, Ltd. v. U.S.,
2007 WL 2714167 (Fed. Cl., Sept. 14, 2007) .......... 5

Magellan Corp v. United States,
27 Fed. Cl. 446 (1993) .......... 29, 30

Overstreet Electric Co. v. U.S.,
47 Fed.Cl. 728 (2000) .......... 31

PGBA, LLC v. United States,
389 F.3d 1219 (Fed.Cir. 2004) .......... 6

Rex Serv. Corp. v. United States,
448 F.3d 1305 (Fed.Cir. 2006) .......... 5

Saratoga Dev. Corp. v. United States,
21 F.3d 445 (D.C.Cir. 1994) .......... 6

Schweiger Constr. Co. v. United States,
49 Fed.Cl. 188 (2001) .......... 18

Statistica, Inc. v. Christopher,
102 F.3d 1577 (Fed.Cir.1996) .......... 30

TRW Environmental Safety Systems, Inc. v. United States,
16 Cl.Ct. 516 (1989) ........ 29

United Int'l Investigative Servs., Inc. v. United States,
41 Fed.Cl. 312 (1998) ........ 31, 32

Virginia Petroleum Jobbers Ass'n v. Federal Power Commission,
259 F.2d 921 (D.C. Cir. 1959) ........ 29

Washington Metropolitan Area Transit Authority v. Holiday Inn,
559 F.2d 841 (D.C. Cir. 1972) ........ 29

Weeks Marine, Inc. v. United States,
2007 WL 3277260 ........ 7, 31

Winstar Comm. Inc. v. United States,
41 Fed.Cl. 748 (1998) ........ 6

STATUTES

5 U.S.C. § 706 ........ 6

5 U.S.C. § 706(2)(A) ........ 6

10 U.S.C. §2304 ........ 28

10 U.S.C. 2304a(d)(3)(A) ........ 11

10 U.S.C. § 2304(a) ........ 25

10 U.S.C. §2304(b) ........ 11

10 U.S.C. § 2304a ........ 9, 16

10 U.S.C. § 2304a(d) (1)(A) ........ 11

10 U.S.C. § 2304c(d) ........ 9

10 U.S.C. § 2305a ........ 20

15 U.S.C. § 631, *et seq.* ........ 21, 28, 30

15 U.S.C. §631(j) ........ 22

15 U.S.C. § 631(j)(3) ........ 25

15 U.S.C. § 632(o)(2) ........ 22

15 U.S.C. § 644(e)(2)(B) ........ 24

28 U.S.C. §1491(b)(1) ........ 5

28 U.S.C. §1491(b)(2) ........ 5

28 U.S.C. §1491(b)(3) ........ 31

31 U.S.C. § 3551(2)(A) ........ 5

40 U.S.C. § 1101, et seq. ........ 20

Competition in Contracting Act, 10 U.S.C. § 2304 ........ 5

Small Business Act, 15 U.S.C. § 631(a) ........ 21

**OTHER AUTHORITIES**

48 C.F.R. 6.401(a), (b)(1) ........ 27

FAR 1.102(b)(iii) ........ 25

FAR 2.101 ........ 22

FAR 6.401 ........ 5,26

FAR 14 ........ 27

FAR 14.103-1(a) ........ 27

FAR 15 ........ 3

FAR 16.5 ........ 11, 14, 15, 19, 30

FAR 16.500(a) ........ 11

FAR 16.501-1 ........ 13, 14

FAR 16.501-2(b) ........ 4

FAR 16.502(a) ........ 11
FAR 16.504 ........ 10
FAR 16.504 and 16.505 ........ 19
FAR 16.504(a) ........ 3
FAR 16.504(a)(4) ........ 12
FAR 16.504(a)(4)(iii) ........ 23, 24
FAR 16.505 ........ 17, 18
FAR 16.505(b)(1) ........ 11
FAR 16.505(b)(5) ........ 12
FAR 16.505(a)(9) ........ 10, 17
FAR 16.506(e) ........ 12
FAR 36.101(c) ........ 15
FAR 36.103 ........ 5
FAR 102-2(a)(5) ........ 25
FAR, Part 14, ........ 26, 28
FAR, Part 15 ........ 26, 27, 28
FAR, Part 36 ........ 15
FAR, Part 37 ........ 14, 15
DFARS 207.170 ........ 22
DFARS 216.501(a)(i) ........ 15
AFARS 5107.170 ........ 22
AFARS 5116.5 ........ 16

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| TYLER CONSTRUCTION GROUP, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. |
| | : | |
| THE UNITED STATES, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION AND DECLARATORY JUDGMENT**

Plaintiff, Tyler Construction Group, ("Tyler"), challenges the decision of the U.S. Army Corps of Engineers, Fort Worth District ("Corps") to solicit the construction of large military complexes, described as Advanced Individual Training (AIT), Basic Training (BT) Barracks, and Warrior in Transitions (WIT) facilities through the use of an Indefinite Delivery/Indefinite Quantity ("IDIQ") procurement. The Plaintiff requests the Court to enjoin the Corps from proceeding with Solicitation No. W9126G-07-R-0122, and to direct the Corps to comply with the laws and regulations that provide for competition in the award of federal construction contracts and that prohibit the consolidation, or "bundling," of construction projects in a manner that severely limits and excludes participation by small business concerns.

## I. ISSUES PRESENTED

The issues in this case are (1) Whether a solicitation for the construction of military facilities in an eight state area in the southeastern United States through the use of a negotiated Multiple Award Task Order Contract violates applicable procurement laws and regulations, and

(2) Whether FAR 16.5 "supplies and services" IDIQ procurement procedures are applicable to the issuance of a solicitation for the design and construction of large military complexes and (3) Whether the solicitation amounts to the unlawful consolidation or "bundling" of construction projects in violation of the Small Business Act and pertinent regulations that protect the interests of small business concerns, and (4) Whether the decision to issue the solicitation as an IDIQ procurement is arbitrary and capricious, an abuse of discretion, and lacking a rational basis.

## II. STATEMENT OF THE CASE

The Corps of Engineers has greatly expanded the use of Indefinite Delivery/Indefinite Quantity ("IDIQ") contracting in recent years for the procurement of construction projects. Historically, IDIQ contracts were utilized by federal agencies to procure supplies and services where items and definable services could be priced at the time of bidding and the government had the flexibility to order those supplies and services at various times and in various quantities over a period of years. The sudden infatuation with this contracting method by the Corps of Engineers, and its questionable application to the construction of large military complexes, provides the backdrop against which the Court is requested to examine the unique facts of this case.

The Corps of Engineers has issued a solicitation that proposes to award up to two IDIQ task order contracts for "Advanced Individual Training (AIT), Basic Training (BT) Barracks, and Warrior in Transition (WIT) Facilities in the Southeast Region (AL,FL,GA,KY,MS,NC,SC,TN), primarily Fort Benning." The solicitation will result, in this case, in the award of up to $301 million worth of construction contracts to one or two contractors who will enjoy the benefit of being able to receive task order awards without competition from other contractors on a project

by project basis. In fact, if only a single award is made, the selected contractor will receive a sole-source contract for up to $301 million of such construction contracts. In other words, although the initial IDIQ's will be awarded through competitive FAR, Part 15, Contracting by Negotiation procedures, there will be no further competition for ensuing task order construction projects if only a single source is selected, or competition will be unduly restricted to only two contractors if two IDIQ's are awarded.

The use of single source IDIQ contracting is generally frowned upon because it ultimately eliminates competition for all of the task order work. Limiting the competition to only two sources is also unduly restrictive of competition. The rationale furnished in the solicitation, under the heading "Overview," is that:

> The Government is looking for ways to streamline construction, manage labor and other resource constraints in an effort to reduce costs and achieve an aggressive schedule in executing task orders to meet the Army's Transformation program goals of faster project execution at lower cost, while taking advantage of industry standards, means and methods.

What the government has done, however, is to take a design/build project for the construction of an initial Basic Training Barracks Complex which could easily have been solicited as a stand-alone project, and has used it as the basis for the elimination of competition, or the severe restriction of competition, for the construction of other broadly defined military complexes and facilities, or virtually any kind of related military construction, in an eight state region for up to three years.

The regulations, at FAR 16.504(a) state that:

> An indefinite-quantity contract provides for an indefinite quantity, within stated limits, of supplies or services during a fixed period. The Government places orders for individual requirements. Quantity limits may be stated as number of units or as dollar values.

The "quantity" in this solicitation is not expressed in terms of units of design/build military complexes, it is expressed in terms of so many dollars worth of construction (up to a limit of $301,000,000). As long as the task orders are not more than $95,000,000 each (Solicitation, page 87), and involve virtually any kind of military construction, those task orders would arguably come within the broad scope of the solicitation. The problem is that the construction of military complexes or facilities, or any other kind of military construction project, is not something that is encompassed by the term "supplies or services." Clearly, the Corps of Engineers is not procuring supplies, and if the object is to procure "services," those services are not identified and are not of a recurring nature.

The Corps' plan is unduly restrictive of competition and amounts to an abuse of the IDIQ procurement process. Although the regulations permit the use of IDIQ procurements to acquire "supplies and services" for which there is a recurring need, the regulations do not explicitly or implicitly suggest that military construction projects are "supplies or services." See FAR 16.501-2(b). The application of this IDIQ procurement method to the acquisition of construction that amount to large multi-million dollar military complexes is a violation of both law and regulation.

If permitted to proceed, the solicitation will have a potentially devastating effect on the Plaintiff, a small business concern, who will be denied the opportunity to compete for the individual construction projects that will be consolidated, or "bundled," into one contract or, at the most, two contracts. Many of the component construction projects that make up these military complexes, on an individual basis, would have provided prime contracting opportunities for small business concerns. Since there is no restriction on the minimum size of any ensuing task order, however, the one or two successful IDIQ contractors could be awarded any number of

task orders less complicated than the proposed initial task order – ones that could be well within the capabilities of small business concerns like the Plaintiff.

The Competition in Contracting Act, 10 U.S.C. § 2304, provides a preference for the use of sealed bidding in procuring construction services, and that law is codified in FAR 36.103 and FAR 6.401. The subject procurement seeks to circumvent the law and regulations by taking a large design/build project and, through a bootstrap approach, use that project to justify the non-competitive award of an unlimited number of task order projects over a three year period amounting to a total price of up to $301 million.

## III. ARGUMENT

### A. Jurisdiction and Standard of Review

The United States Court of Federal Claims has "jurisdiction to render judgment on an action by an interested party objecting to ... any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 § U.S.C. 1491(b)(1); Erinys Iraq, Ltd. v. U.S., 2007 WL 2714167, (Fed. Cl., Sept. 14, 2007). Section 1491(b)(2) explicitly provides that, in any action under 1491(b), "the court may award any relief that the court considers proper, including declaratory and injunctive relief."

The Competition in Contracting act defines "[t]he term 'interested party', with respect to a contract or a solicitation or other request for offers ... [as] an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2)(A); see also Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed.Cir. 2006). Plaintiff, a small business construction contractor, has successfully performed a number of construction contracts for the Corps of Engineers and other

federal agencies in the same geographic region that is encompassed by the subject solicitation. Therefore, as a prospective offeror on the types of construction projects that have been bundled into this solicitation, Plaintiff qualifies as an interested party and has standing to invoke the court's jurisdiction in this matter.

In evaluating an agency procurement decision the Administrative Procedure Act, 5 U.S.C. § 706 (the "APA") gives the court discretion to set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); PGBA, LLC v. United States, 389 F.3d 1219, 1224-28 (Fed.Cir. 2004). Agency action is deemed to be arbitrary or capricious when it lacks any rational basis or is an abuse of discretion. Saratoga Dev. Corp. v. United States, 21 F.3d 445, 456 (D.C.Cir. 1994). In addition, agency procurement procedures that are contrary to applicable laws and regulations violate the APA standard. 5 U.S.C. § 706(2)(A); Bannum v. United States, 404 F.3d 1346 at 1351, (Fed. Cir. 2005). These standards form the framework by which to measure the Corps' decision to use negotiated IDIQ contracting procedures to procure open-ended construction services.

In an ordinary post-award protest, the plaintiff must demonstrate "substantial prejudice" by showing that there was a "substantial chance" it would have been awarded the contract but for the agency's error. Bannum, Inc. v. United States, 404 F.3d 1346, 1353 (Fed.Cir. 2005). This standard, however, cannot be applied in the context of a solicitation-based protest because the offerors have yet to submit proposals to the agency. In the context of a solicitation-based protest, the plaintiff may satisfy the prejudice requirement by showing that an unreasonable agency decision "created a non-trivial competitive injury which can be redressed by judicial relief." Winstar Comm. Inc. v. United States, 41 Fed.Cl. 748, 763 n.9 (1998). In a recent decision, the

Court held that a party that brings a protest challenging the terms of a solicitation need not satisfy the "substantial chance for award" test, but rather need only identify a non-trivial competitive injury. Weeks Marine, Inc. v. United States, 2007 WL 3277260, Fed.Cl., November 06, 2007.

Under this MATOC solicitation, the Plaintiff would be precluded from consideration for award of the bundled contract. However, if the projects were procured as stand-alone solicitations, either as sealed bid or negotiated procurements, there is a substantial chance that Plaintiff would be the lowest responsive and responsible bidder, or selected as the best value offeror, on some of the described projects in the southeastern United States during the next three years. This non-trivial competitive injury is capable of being redressed by the Court.

**B. The Use Of A Negotiated IDIQ Solicitation To Procure Open-Ended Construction Task Order Projects Violates Applicable Law And Regulation**

The solicitation provides for the award of one IDIQ contract, or at the most two IDIQ contracts, for three types of construction projects described as "Advanced Individual Training (AIT), Basic Training (BT) Barracks, and Warrior in Transition (WIT) Facilities in the Southeast Region (AL,FL,GA,KY,MS,NC,SC,TN), primarily at Fort Benning, Georgia." Significantly, the solicitation does not preclude, or in any way prevent, the Corps of Engineers from issuing task orders for any type of military construction within the designated region, nor does it preclude the award of task orders for portions or components of the described "complexes" or "facilities."

The overly-broad scope of work gives the Corps the flexibility and the opportunity to issue task orders in the eight listed states for any design and/or construction work that is related to the "transformation" of the Army, not just for the construction of "complexes" that are described in the solicitation. This possibility is supported by the fact that the Corps has not identified any task orders or proposed locations beyond the work identified in the initial task

order. The Corps clearly has reserved the open-ended opportunity to creatively procure design and construction services on what can either be a sole source basis, or an unduly restricted competitive basis, for the base year and two option years, limited only by the available funding. It is entirely conceivable, therefore, that task order construction projects could be awarded under the broad umbrella of the master task order contract or contracts that would otherwise be suitable as stand-alone projects within the capabilities of the small business construction contracting community.

An example of the Corps' creative adaptation of an IDIQ contract to issue task orders outside the apparent scope of the original contract currently exists in the same geographic region. The Corps issued a broad IDIQ contract for "general construction" in Georgia. (Contract No. W912HN-07-D-0053). The first task order, an Armored Training Facility, was issued for work in Georgia. The Corps subsequently issued a second task order for a Chaplaincy Center in South Carolina. The Corps obviously did not treat the geographic limitation in the contract as a restriction on its ability to issue task orders outside of the boundaries of the state of Georgia.

Similarly, since the current solicitation does not specifically limit the type of design or construction services to be performed, the Corps may issue task orders for any design-build or construction project as long as it arguably supports the Army's transformation goal. In fact, as seen above in the Georgia contract, the Corps may even feel free to issue task order work beyond the eight-state geographic region listed in the solicitation. Any such departure from the terms or intent of the original contract will be insulated from judicial review, however, because disappointed offerors will not have post-award standing to protest individual task orders, and the fortunate awardee, or two awardees, will be unlikely to object to the award of additional work.

A secondary, although significant, effect of the Defendant's use of IDIQ contracting to procure construction on a regional, and high dollar value, basis results from the limitation on task order protests set forth in FASA (10 U.S.C. § 2304a). The statute provides that task orders issued under IDIQ contracts are generally not subject to protest, except when the task order is beyond the scope, period, or maximum dollar value of the IDIQ contract. 10 U.S.C. § 2304c(d). This immunity from judicial review of an agency's discretionary actions is particularly disturbing when the agency excessively broadens the scope of a task order procurement so that no task order is beyond the scope. Examples of an overly broad definition of scope would be where the task order contract applies to an entire region of the country, or as sometimes the case, where the agency defines the scope as the entire United States, or the entire world. (Some agencies, such as the U.S. Air Force, have defined the worksite for MATOC procurements as CONUS (Continental United States), or OCONUS (Outside the Continental United States). In the instant case, the Defendant has identified the worksite as the southeastern United States, a region that extends beyond the range of most small business concerns, and also many large businesses, as well.

This means that even when there are multiple award task order contracts, the selected contractors forfeit most of the protest rights they would otherwise have when competing for stand-alone construction projects. It is submitted that the Congress did not intend to deny the right to protest on such a wide scale as to effectively take billions of dollars worth of construction contracts outside of the realm of judicial review. In fact, in commenting on this subject in a recent decision, Judge Wheeler of this Court stated that:

> A disturbing feature of SAD's [**the Corps of Engineers South Atlantic Division encompassing a region very similar to the instant case**] new procurement method is that approximately $2 billion in task order awards during the next five years would become virtually immune from any judicial or administrative bid protest review. The Federal Acquisition Streamlining Act of 1994 ("FASA") provides that "[a] protest is not authorized in connection with the issuance of a task order or delivery order except for a protest on the ground that the order increases the scope, period, or maximum value of the contract under which the order is issued." 10 U.S.C. § 2304c(d); see also FAR ¶ 16.505(a)(9) (same provision). While SAD's current sealed bid awards routinely are subject to bid protest review by the Government Accountability Office ("GAO") or this Court, SAD's task order awards would be insulated from review except in very limited circumstances. Thus, while purporting to use highly discretionary "best value" evaluation procedures in awarding task orders, SAD effectively would remove itself from any bid protest oversight. Defendant argues that the Court must apply the FASA provision that Congress created. However, this provision did not authorize SAD to convert all of its procurements into task orders. The agency's Administrative Record contains no mention or discussion of this important concern. Despite SAD's attempt to insulate itself from any bid protest review, the Court would be constrained to uphold SAD's new procurement method if it complied with law, and if the reasoning behind the new method was rationally based. However, this is not the case. [**explanatory note added.**]

**1. The Solicitation Violates Applicable Law and Regulation Governing IDIQ Procurement**

The use of task or delivery order contracts is authorized by the Federal Acquisition Streamlining Act of 1994 ("FASA"), 10 U.S.C. § 2304a, and FAR 16.504. FASA provides that a solicitation for a task or delivery order contract shall include the following:

> (1) The period of the contract, including the number of options to extend the contract and the period for which the contract may be extended under each option, if any.

> (2) The maximum quantity or dollar value of the services or property to be procured under the contract.

> **(3)** A statement of work, specifications, or other description that reasonably describes the general scope, nature, complexity, and purposes of the services or property to be procured under the contract. 10 U.S.C. § 2304a(b).

The law further provides that the head of an agency must approve a single task order or delivery contract, 10 U.S.C. § 2304a(d) (1)(A), and the law further provides a preference for the award of multiple, rather than single, task or delivery order contracts. 10 U.S.C. 2304a(d)(3)(A).

The Federal Acquisition Regulation addresses the subject of Indefinite Delivery Contracts (IDCs) in Part 16.5. The regulation states that "This subpart prescribes policies and procedures for making awards of indefinite-delivery contracts and establishes a preference for making multiple awards of indefinite-quantity contracts." FAR 16.500(a). There are three types of indefinite delivery contracts: definite-quantity contracts, requirements contracts, and indefinite-quantity contracts. FAR 16.502(a).

The applicable Federal Acquisition Regulations provide that a solicitation and contract for an indefinite quantity must —

> (i) Specify the period of the contract, including the number of options and the period for which the Government may extend the contract under each option;
>
> (ii) Specify the total minimum and maximum quantity of supplies or services the Government will acquire under the contract;
>
> (iii) Include a statement of work, specifications, or other description, that reasonably describes the general scope, nature, complexity, and purpose of the supplies or services the Government will acquire under the contract in a manner that will enable a prospective offeror to decide whether to submit an offer;
>
> (iv) State the procedures that the Government will use in issuing orders, including the ordering media, and, if multiple awards may be made, state the procedures and selection criteria that the Government will use to provide awardees a fair opportunity to be considered for each order (see 16.505(b)(1));

(v) Include the name, address, telephone number, facsimile number, and e-mail address of the agency task and delivery order ombudsman (see 16.505(b)(5)) if multiple awards may be made;

(vi) include a description of the activities authorized to issue orders; and

(vii) Include authorization for placing oral orders, if appropriate, provided that the Government has established procedures for obligating funds and that oral orders are confirmed in writing.

FAR 16.504(a)(4).

The solicitation includes the clause prescribed by FAR 16.506(e), as follows:

Indefinite Quantity (Oct 1995)

(a) This is an indefinite-quantity contract for the supplies or services specified, and effective for the period stated, in the Schedule. The quantities of supplies and services specified in the Schedule are estimates only and are not purchased by this contract.

(b) Delivery or performance shall be made only as authorized by orders issued in accordance with the Ordering clause. The Contractor shall furnish to the Government, when and if ordered, the supplies or services specified in the Schedule up to and including the quantity designated in the Schedule as the "maximum." The Government shall order at least the quantity of supplies or services designated in the Schedule as the "minimum."

(c) Except for any limitations on quantities in the Order Limitations clause or in the Schedule, there is no limit on the number of orders that may be issued. The Government may issue orders requiring delivery to multiple destinations or performance at multiple locations.

(d) Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order. The contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; *provided*, that the Contractor shall not be required to make any deliveries under this contract after ____ ________ [*insert date*].

The solicitation provides for the selection of a single contractor, or at the most two contractors (that may be joint ventures or teams), that will be selected after a two-step proposal

process. (Solicitation, page 6)). The resulting IDIQ contracts will enable the selected contractor, or contractors, to become the only competitors for the negotiation of task orders that may be of any value, subject to the limitation that the contractor is not obligated to honor task orders of less than $15,000,000 or more than $95,000,000 in value. (Solicitation, page 87). A "task order contract" is defined as a "contract for services that does not procure or specify a firm quantity of services (other than a minimum or maximum quantity) and that provides for the issuance of orders for the performance of tasks during the period of the contract." FAR 16.501-1.

While the law and regulations provide for the procurement of both supplies and services, an IDIQ contract has historically been used for the procurement of virtually identical supplies or services, for which there is a recurring need, on a single installation or within a small geographic area. The unit cost of these supplies or services has not generally amounted to millions of dollars per unit. For example, an agency might have a recurring need to purchase a particular part at indefinite times and for indefinite quantities. An IDIQ contract gives the agency the right to order those parts, at an established price, at various times and in various quantities within the duration of the contract. Similarly, something like janitorial services, priced in advance at a daily or hourly rate, can easily be ordered on as needed basis. Construction "services," however, are not so straightforward.

While it is conceivable that construction "services" like roofing repairs could be priced in advance and ordered as needed, the procurement of a large military complex and facility is site specific and may vary significantly in cost depending on location, the local construction labor market, the fluctuating cost of materials, the weather, and many other factors. It is one thing to

order 1,000 widgets one month and 1,500 widgets the next month, but is quite another thing to order quantities of military complexes.

Although the term "services" is not defined in the context of the "supplies or services" that may be acquired under an IDIQ contract (FAR 16.5), or as the term is used within the context of task orders as described in FAR 16.501-1, the regulations provide some insight into what is intended when supplies or services are procured by the IDIQ method. The regulations offer the following "advantages" for all three types of indefinite delivery contracts:

> b) The various types of indefinite-delivery contracts offer the following advantages:
>
> (1) All three types permit—
>
> (i) Government stocks to be maintained at minimum levels; and
>
> (ii) Direct shipment to users.
>
> (2) Indefinite-quantity contracts and requirements contracts also permit—
>
> (i) Flexibility in both quantities and delivery scheduling; and
>
> (ii) Ordering of supplies or services after requirements materialize.
>
> (3) Indefinite-quantity contracts limit the Government's obligation to the minimum quantity specified in the contract.
>
> (4) Requirements contracts may permit faster deliveries when production lead time is involved, because contractors are usually willing to maintain limited stocks when the Government will obtain all of its actual purchase requirements from the contractor.

All of these advantages pertain to items in the nature of supplies and do not suggest, in any way, the procurement of large design/build military complexes. This is a perfectly logical and reasonable observation given the clear distinction that the FAR generally makes in describing "supplies" (the subject of many FAR provisions and clauses), "services" (FAR, Part 37) and

"construction" (FAR, Part 36; FAR 36.101(c)). Yet, FAR 16.5, in providing the rules regarding all types of indefinite delivery contracts, only mentions "supplies and services" and does not mention "construction" even once.

FAR, Part 37, does address "services," however, in defining service contracts, as follows:

> "Service contract" means a contract that directly engages the time and effort of a contractor whose primary purpose is to perform an identifiable task rather than to furnish an end item of supply. A service contract may be either a nonpersonal or personal contract. It can also cover services performed by either professional or nonprofessional personnel whether on an individual or organizational basis. Some of the areas in which service contracts are found include the following:
>
> (1) Maintenance, overhaul, repair, servicing, rehabilitation, salvage, modernization, or modification of supplies, systems, or equipment.
>
> (2) Routine recurring maintenance of real property.
>
> (3) Housekeeping and base services.
>
> (4) Advisory and assistance services.
>
> (5) Operation of Government-owned equipment, real property, and systems.
>
> (6) Communications services.
>
> (7) Architect-Engineering (see Subpart 36.6).
>
> (8) Transportation and related services (see Part 47).
>
> (9) Research and development (see Part 35).

What is interesting, and instructive, is that none of these "services" refer to construction, other than possibly maintenance and repair and, most assuredly, nothing on this list describes the construction of large military complexes of the sort envisioned by this solicitation.

In fact, even the supplemental federal acquisition regulations do not anticipate the huge scale of the "services" proposed by this solicitation. The Defense Federal Acquisition Regulation Supplement ("DFARS"), for example, speaks of using indefinite delivery contracts to procure items with a shelf-life of less than six months. See DFARS 216.501(a)(i). The Army Federal

Acquisition Regulation Supplement ("AFARS") only addresses indefinite delivery contracts in the context of multiple award task orders. See AFARS 5116.5. Even the Corps of Engineers' own procurement regulations ("EFARS") do not specifically address the acquisition of construction through the MATOC method that is being applied here.

In an apparent attempt to circumvent the statutory (10 U.S.C. § 2304a) preference for competitive IDIQ contracts, in those cases where IDIQ procurements are otherwise authorized, the Defendant has stated that it intends to award two IDIQ contracts, but it reserves the right to award only one. This tactic appears to be in response to the Plaintiff's previous protest against the issuance of a SATOC solicitation that was converted to a MATOC, but ultimately cancelled. If only one IDIQ contract is awarded, that will be a Single Award Task Order Contract ("SATOC"), not a MATOC, and will clearly violate the statutory preference for competition. The agency should not be permitted to violate statutory requirements in the future by simply reserving the right to do so. If it is improper to solicit these construction projects on a SATOC basis in the first place, and we believe that it is, the reservation of a right to convert the purported MATOC to a SATOC should not be permitted by this Honorable Court.

The use of IDIQ procedures for the procurement of major construction, in the last analysis, makes no sense. That is why the solicitations that have been previously issued have been riddled with defects. The Corps is attempting to fit a square peg into a round hole and it simply does not work. As the Court is aware, the Plaintiff protested two previous IDIQ solicitations and provided arguments addressing the same issues that are being presented to the Court in this case. Both of those solicitations were cancelled before the issues could be decided by the Court because the Defendant either agreed that there were secondary defects in the

solicitation, as pointed out by the Plaintiff, or because the Defendant found other defects that needed to be corrected. This, unfortunately, is what happens when an agency is navigating in uncharted waters and where its procurement methods are not in accordance with applicable procurement regulations.

As an example, when it became apparent to the Corps that the Plaintiff , and possibly others, had correctly pointed out that the Corps' IDIQ procurements violated its own Engineer Federal Acquisition Regulation Supplement ("EFARS"), the Corps simply rescinded the regulation on January 29, 2008. While we do not question the agency's right to rescind its own regulations, we wonder whether any thought was given to the fact that the policy provided by the rescinded regulation was, in fact, valid. Rather than rescind the regulation, we believe that it would have been more appropriate for the Corps of Engineers to have rescinded the IDIQ procurements, like the one at hand, that violate the policies espoused by those regulations.

The issue of whether contracts for construction can be solicited using the IDIQ supplies and services procedures specified in FAR 16.505 has, according to our research, only been addressed once by the Court, and even then the Court only dealt with the issue in a tangential manner. The Court stated that "there does not appear to be any impediment to using supplies and services IDIQ contracts, described by FAR subpart 16.5, for contracts which are specifically for construction services or construction-related services." A&D Fire Protection, Inc. v. U.S., 72 Fed.Cl. 126 (2006). The case principally dealt with the issue of whether the plaintiff was barred by statute from protesting the award of a task order under an existing IDIQ contract, and the Court concluded that the FAR 16.505(a)(9) prohibition on the protest of task order awards applied to protests on "construction services or construction-related services contracts." A&D

Fire Protection, at page 136. (The contract had been awarded by the GSA for "Repair and Alterations, Renovations and other Construction Related Services" in Arizona, Nevada and/or California, and the plaintiff was one of multiple awardees eligible to compete for the various task orders).

Although it played no part in the Court's ultimate ruling that the plaintiff was barred by statute from filing a protest, the Court noted that the plaintiff had asserted at oral argument, for the first time, that the master IDIQ contract and the task order at issue were for "construction services." The plaintiff argued that "construction services" could not be procured under the procedures provided by FAR 16.505 because that section of the FAR applied only to "supplies and services, not construction." The Court disagreed and concluded that "there does not appear to be any impediment to using supplies and services IDIQ contracts, described by FAR subpart 16.5 for contracts which are specifically for construction services or construction-related services."

In its discussion of "construction services or construction-related services" the Court cited Abatement Contracting Corp. v. United States, 58 Fed.Cl. 594, 595, 604 (2003), a case that dealt with a dispute involving an indefinite delivery contract entitled "Requirements Contract for Asbestos Removal and Insulation Installation, U.S. Naval Academy and U.S. Naval Station, Annapolis, Maryland"; and, Schweiger Constr. Co. v. United States, 49 Fed.Cl. 188, 190, 194 (2001), a case that dealt with an "Indefinite Quantity Term Construction Contract" issued by the GSA for work that was to involve "relatively small, repetitive, unscheduled construction services in GSA owned or leased buildings in the Kansas City metropolitan area where, based on past needs or requirements, the government expected similar services would be required during the

contract term." It is significant that both of the examples cited by the Court were contracts that dealt with definable services which could be priced in advance on a bid schedule and ordered much in the same way that supplies are ordered.

While the work in the cases cited as examples may have generally related to construction, it was more in the nature of "supplies and services" than construction. Therefore, although the Court noted that it found "no caselaw forbidding the government from using the IDIQ supplies and services contracting vehicle described in FAR 16.504 and 16.505 in the construction context," A&D Fire Protection, Inc. v. U.S., 72 Fed.Cl. 126, at 136 (2006), this does not mean that the Court found that the term "supplies and services" encompasses the sort of major military construction projects envisioned by the instant solicitation. Most assuredly, the examples cited by the Court did not equate, in any way, to the kind of major construction projects being solicited by the Corps of Engineers in this case.

It is also significant that the Court used the phrase "IDIQ supplies and services contracting vehicle" in referring to the procedures specified in FAR 16.5. As stated previously in this Memorandum, there are supply contracts, there are service contracts, and there are construction contracts in federal procurement. The collective term "supplies and services" as that term is used in FAR 16.5, and as implicitly recognized by the Court in the A&D Fire Protection Case, supra, is not a term that applies to the construction of the large military complexes and related military construction projects being solicited here. These projects cannot legally or rationally be procured by the Corps as if they are commodities in the nature of fuel oil, supplies in the nature of paper clips, or services in the nature of minor repairs, by employing a contracting method that excludes the sizeable small business construction community from

participating, as prime contractors, in the competition for $301 million worth of major construction work. In fact, the wide spread use of MATOC solicitations by the Corps of Engineers, with proposals due on nine unrestricted such solicitations by the Fort Worth District alone on February 20, 2008, shows that billions of dollars of construction work s being denied to small business concerns. (It should also be noted that it defies the imagination that Congress, when it enacted the statute authorizing procurement of construction using design-build, (10 U.S.C. § 2305a), meant to unleash a monster that would shield the design work for virtually all military construction in the United States from the statutory requirements of the Brooks Act (40 U.S.C. § 1101, et seq.).)

The fact that the military complexes being procured are not susceptible to inclusion within the term "supplies and services" is further demonstrated by the Corps' failure to identify with specificity any project or workload beyond the initial task order. The "quantity" for purposes of the "indefinite-quantity" portion of the term "IDIQ" is nothing more, in this solicitation, than a quantity of potential dollars to be spent. This lack of specificity makes it impossible for any offeror to evaluate the nature or location, within any of the listed eight states, of other task orders that might be solicited under this procurement. In fact, the Corps has failed to even include an estimated workload for the base year and each of the option years. Again, it simply chose to advise offerors that the overall program amount may not exceed 301 million dollars.

Moreover, the solicitation has been shaped to all but exclude small businesses from competition. While the solicitation has defined small businesses as those contractors with average annual receipts of 31 million dollars per year, the solicitation identifies the "typical

construction value" for a complex as $31,250,000, an amount that exceeds the size standard for small businesses. Also, the contract magnitude of the first task order to build a complex is between $25 million and $100 million, an amount that is in excess of the bonding capacity of most small business contractors. Additionally, by setting the maximum amount of the IDIQ solicitation at the proposed program amount of 301 million dollars over three years, it is apparent that the Corps has not given realistic or appropriate consideration to the ability of small businesses to compete for the required work given the disparity in the size standard compared to the potential workload.

**2. The Solicitation Illegally Bundles Multiple Construction Projects In Violation Of The Small Business Act**

The Small Business Act, 15 U.S.C. § 631(a) provides that:

> The essence of the American economic system of private enterprise is free competition. Only through full and free competition can free markets, free entry into business, and opportunities for the expression and growth of personal initiative and individual judgment be assured. The preservation and expansion of such competition is basic not only to the economic well-being but to the security of this Nation. Such security and well-being cannot be realized unless the actual and potential capacity of small business is encouraged and developed. It is the declared policy of the Congress that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise, to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the government (including but not limited to contracts or subcontracts for maintenance, repair, and construction) be placed with small-business enterprises, to insure that a fair proportion of the total sales of Government property be made to such enterprises, and to maintain and strengthen the overall economy of the Nation.

To comply with this statement of congressional policy, federal law also requires that:

> . . .each Federal agency, to the maximum extent practicable, shall--
>
> (1) comply with congressional intent to foster the participation of small business concerns as prime contractors, subcontractors, and suppliers;

> (2) structure its contracting requirements to facilitate competition by and among small business concerns, taking all reasonable steps to eliminate obstacles to their participation; and
>
> (3) avoid unnecessary and unjustified bundling of contract requirements that precludes small business participation in procurements as prime contractors.

15 U.S.C. §631(j).

To implement this restriction, the Small Business Act defines bundling as "consolidating 2 or more procurement requirements for goods or services previously provided or performed under separate smaller contracts into a solicitation of offers for a single contract that is likely to be unsuitable for award to a small-business concern due to-

> (A) the diversity, size, or specialized nature of the elements of the performance specified;
>
> (B) the aggregate dollar value of the anticipated award;
>
> (C) the geographical dispersion of the contract performance sites; or
>
> (D) any combination of the factors described in subparagraphs (A), (B), and (C). 15 U.S.C. § 632(o)(2); *see also* FAR sect. 2.101.

(The Department of Defense and the Department of the Army both refer to "bundling" as "consolidation of contract requirements" in their regulations). (DFARS 207.170; AFARS 5107.170).

The essential problem with this procurement is that the contracting community has no way of knowing whether the ensuing task orders will be made up of projects that would have been suitable for award to small business or not. The Corps of Engineers has defined the initial design/build task order, but has reserved the open-ended right to define the scope and size of ensuing task orders as it sees fit. In doing so, not only are the delivery and the quantity

indefinite, <u>the makeup and size of the projects themselves are also indefinite</u>. That is not what is intended by an IDIQ contract. In fact, FAR 16.504(a)(4)(iii) provides that an IDIQ contract must:

> Include a statement of work, specifications, or other description, that reasonably describes the general scope, nature, complexity, and purpose of the supplies or services the Government will acquire under the contract in a manner that will enable a prospective offeror to decide whether to submit an offer.

The scope of work in the MATOC solicitation itself, while generally described, is to be priced by inserting prices on three CLINs ("Contract Line Item Numbers") on the bid schedule. Significantly, each of the line items contains essentially the same wording, and each one simply requires pricing for each year of the contract. The wording for each CLIN is as follows:

> 0001 - BASE YEAR
> FFP
> MULTIPLE AWARD TASK ORDER CONTRACT (MATOC) FOR ADVANCED INDIVIDUAL TRAINING (AIT), BASIC TRAINING (BT) BARRACKS, AND WARRIOR IN TRANSITION (WIT) FACILITIES IN THE SOUTHEAST REGION (AL,FL,GA,KY,MS,NC,SC,TN), PRIMARILY FORT BENNING. The guaranteed minimum of $10,000.00 is for the base period only with an estimated program total (base year plus three option years) is $301,000,000.00.
>
> FOB: Destination
>
> 0002 - OPTION YEAR 1
> FFP
> MULTIPLE AWARD TASK ORDER CONTRACT (MATOC) FOR ADVANCED INDIVIDUAL TRAINING (AIT), BASIC TRAINING (BT) BARRACKS, AND WARRIOR IN TRANSITION (WIT) FACILITIES IN THE SOUTHEAST REGION (AL,FL,GA,KY,MS,NC,SC,TN), PRIMARILY FORT BENNING. There is no guaranteed minimum for Option Year 1. The estimated program total (base year plus three option years) is $301,000,000.00.
>
> FOB: Destination
>
> 0003 - OPTION YEAR 2
> FFP
> MULTIPLE AWARD TASK ORDER CONTRACT (MATOC) FOR ADVANCED INDIVIDUAL TRAINING (AIT), BASIC TRAINING (BT)

BARRCKS, AND WARRIOR IN TRANSITION (WIT) FACILITIES IN THE SOUTHEAST REGION (AL,FL,GA,KY,MS,NC,SC,TN), PRIMARILY FORT BENNING. There is no guaranteed minimum for Option Year 2. The estimated program total (base year plus three option years) is $301,000,000.00.

FOB: Destination

(The references to "three option years" in each of these CLINs appears to be an error since the solicitation only provides for a base year and two option years).

The offeror is not required to insert a price for the proposed initial task order (until Phase 2 of the procurement), and there is no way for offerors to know what they are pricing on any of the line items in the MATOC solicitation. This only serves to highlight what a mockery this procurement makes of the IDIQ process; the Corps of Engineers cannot even describe, for price comparison purposes, what service or "quantity" it is actually attempting to procure in this IDIQ solicitation. The solicitation provides absolutely no basis for offerors to price their proposals and therefore provides no basis to consider price in the selection of the contractors to be short-listed after Phase 1. In doing so, the solicitation violates FAR 16.504(a)(4)(iii), as described above.

It must be noted, however, that the Small Business Act's statutory prohibition against bundling requirements is not absolute, and an agency may determine that consolidation of requirements is "necessary and justified if, as compared to the benefits that would be derived from contracting to meet those requirements if not consolidated, the Federal Government would derive from the consolidation measurably substantial benefits, including any combination of benefits that, in combination, are measurably substantial." 15 U.S.C. § 644(e)(2)(B). The FAR states that these benefits may be identified as follows:

> Measurably substantial benefits may include, individually or in any combination or aggregate, cost savings or price reduction, quality improvements that will save time or improve or enhance performance or efficiency, reduction in acquisition cycle times, better terms and conditions, and any other benefits. The agency must

> quantify the identified benefits and explain how their impact would be measurably substantial. Except as provided in paragraph (d) of this section, the agency may determine bundling to be necessary and justified if, as compared to the benefits that it would derive from contracting to meet those requirements if not bundled, it would derive measurably substantial benefits equivalent to-ten percent of the estimated contract or order value (including options) if the value is $86 million or less. FAR sect. 7.107(b).

The bundling of the types of straightforward, easily segregable, construction projects that make up the military complexes envisioned by the solicitation will not provide the kind of measurably substantial benefits sufficient to justify the unduly restrictive, or, if only one IDIQ contract is awarded, non-competitive, award of task orders amounting to as much as $301 million. In fact, the harm that will accrue to both the large and small business concerns who will be excluded from the right to compete for that work is immeasurable in terms of lost opportunities and lost jobs.

There are 2,548 small business contractors under the applicable NAICS code and not one of them will qualify for the award of the prime contract work being solicited here. (See www.ccr.gov). Accordingly, the procurement is in direct violation of the Small Business Act and its requirement that "to the maximum extent practicable," each agency shall "avoid unnecessary and unjustified bundling of contract requirements that precludes small business participation in procurements as prime contractors." 15 U.S.C. § 631(j)(3) (2000).

**3. The Solicitation Violates The Statutory Preference For Sealed Bidding in Construction Contracting**

It is a "guiding principle" of the Federal Acquisition System that federal agencies are to promote competition in procurement. FAR 1.102(b)(iii); FAR 102-2(a)(5). The general requirement to use competitive procedures in government procurements is codified in 10 U.S.C. § 2304(a), as follows:

**§ 2304. Contracts: competition requirements**

(a)(1) Except as provided in subsections (b), (c), and (g) and except in the case of procurement procedures otherwise expressly authorized by statute, the head of an agency in conducting procurement for property or services—

(A) shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this chapter and the Federal Acquisition Regulation; and

(B) shall use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement.

(2) In determining the competitive procedure appropriate under the circumstances, the head of an agency–

(A) *shall* solicit sealed bids if–

(i) time permits the solicitation, submission, and evaluation of sealed bids;

(ii) the award will be made on the basis of price and other price-related factors;

(iii) it is not necessary to conduct discussions with the responding sources about their bids; and

(iv) there is a reasonable expectation of receiving more than one sealed bid; and

(B) *shall* request competitive proposals if sealed bids are not appropriate under clause (A).

(Emphasis supplied). These criteria have also been codified in FAR 6.401, as follows:

**6.401 Sealed bidding and competitive proposals.**

Sealed bidding and competitive proposals, as described in Parts 14 and 15, are both acceptable procedures for use under Subparts 6.1, 6.2; and, when appropriate, under Subpart 6.3.

(a) Sealed bids. (See part 14 for procedures.) Contracting officers *shall* solicit sealed bids if–

(1) Time permits the solicitation, submission, and evaluation of sealed bids;

(2) The award will be made on the basis of price and other price-related factors;

(3) It is not necessary to conduct discussions with the responding offerors about their bids; and

(4) There is reasonable expectation of receiving more than one sealed bid.

(b) Competitive proposals. (See FAR, Part 15, for procedures.)

(1) Contracting officers may request competitive proposals if sealed bids are not appropriate under paragraph (a) above. . . . .

48 C.F.R. 6.401(a), (b)(1). Thus, whenever the four enumerated criteria are met, both statute and regulation require that sealed bids be solicited under FAR 14, and not competitive proposals under FAR 15. See also FAR 14.103-1(a), which provides that "[s]ealed bidding shall be used whenever the conditions in 6.401(a) are met" (emphasis supplied).

Accordingly, the question presented in this proceeding is whether or not the employment of a negotiated MATOC procurement by the Corps is in violation of the statute and the FAR. Plaintiff submits that although there may be a justification to utilize FAR, Part 15, contracting by negotiation procedures for the initial design/build task order, there is no basis to conclude that sealed bidding will not be appropriate for the ensuing, and yet undefined, future task order work. That is one of the major problems with this procurement – once the proposed IDIQs, or sole IDIQ, is in place, each and every task order will have been pre-ordained as suitable for unduly restrictive, or non-competitive, negotiated procurement. Thus, if the Corps decides to employ the IDIQ contractor to build a $10 million facility, something that clearly would be suitable for

sealed bidding by large and small business concerns, there will be nothing to prevent the Corps from doing so and the construction contracting community will be left without a remedy.

The FAR provides for two basic forms of procurement: Sealed Bidding under FAR, Part 14, and Contracting by Negotiation under FAR, Part 15. The statutory requirement for competitive procurement is an integral part of both of those acquisition procedures. What the Corps is attempting to do, for the apparent sake of expediency, is to use competitive negotiated procedures to select one, or at the most two, contractors who will then perform ensuing task orders with little or no competition. Through a distortion of the IDIQ procurement vehicle, the Corps of Engineers is violating the spirit, intent, and letter of federal procurement law and regulation.

**C. The Proposed IDIQ Solicitation Is Arbitrary And Capricious**

The proposed IDIQ solicitation creates a protective umbrella under which the selected contractor, or two contractors, can freely be awarded, potentially non-competitive, task orders for large military complexes like the initial task order, or for any construction work that the agency, in its discretion, decides to procure. In this regard, the solicitation not only violates the Small Business Act, (15 U.S.C. § 631, *et seq.*), the Competition in Contracting Act, (10 U.S.C. § 2304), and the various procurement regulations cited in the preceding sections, it arbitrarily and capriciously denies the Plaintiff a fair opportunity to compete for hundreds of millions of dollars worth of construction projects. There is no rational basis for taking all of the construction activities that make up the construction of the military complexes described in the solicitation, and reserving that work for one or two fortunate contractors to the exclusion of the entire small business contracting community.

**D. Criteria For Injunctive Relief**

In order to obtain temporary injunctive relief, the Plaintiff must demonstrate:

(1) substantial probability that the Plaintiff will prevail on the merits;

(2) irreparable harm to the Plaintiff unless the injunction is granted;

(3) absence of substantial harm to other interested parties; and

(4) absence of harm to the public interest.

Virginia Petroleum Jobbers Ass'n v. Federal Power Commission, 259 F.2d 921 (D.C. Cir. 1959). However, the evidence presented for each of these criteria is balanced by the court on a sliding scale basis. A much stronger showing on one or more of the necessary factors lessens the amount of proof required for the remaining factors. Washington Metropolitan Area Transit Authority v. Holiday Inn, 559 F.2d 841 (D.C. Cir. 1972).

The Plaintiff will address the four above enumerated factors in light of the facts and applicable cases. For the reasons set forth below, Plaintiff submits that it is entitled to the relief sought.

**E. Likelihood of Success on The Merits**

In considering whether to grant interim injunctive relief pending a final decision on the merits, the Court of Federal Claims has consistently held that the "likelihood of success" is a flexible factor and does not require a certain "mathematical probability." Magelian Corp v. United States, 27 Fed. Cl. 446, (1993); TRW Environmental Safety Systems, Inc. v. United States, 16 Cl.Ct. 516 (1989). For purposes of a preliminary injunction, it is sufficient if the plaintiff can demonstrate either (1) "a combination of probable success on the merits and the possibility of irreparable injury," or (2) "that serious questions are raised and the balance of

hardships tips sharply in favor" of the plaintiff. Id. at 527. As demonstrated below, Plaintiff's request for preliminary injunctive relief meets these standards.

To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed.Cir.1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed.Cir.1996). In the case at hand, the use of IDIQ procurement procedures under FAR 16.5, that are intended to apply to the recurring need to obtain supplies and services, to the procurement of large, site specific, military complexes is a distorted and illegal use of this procurement vehicle. The Small Business Act (15 U.S.C. § 631, *et seq.*) prohibits the bundling of individual projects in a manner that because of the accumulated size and geographic dispersion will make the resulting large project unsuitable for small business. Accordingly, the clear violation of procurement law and regulation makes it likely that the Plaintiff will prevail on the merits.

**F. Plaintiff Will Suffer Irreparable Harm If Relief Is Not Granted**

When assessing irreparable injury, "[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction." Magellan Corp. v. United States, 27 Fed.Cl. 446, 447 (1993). While the harm to Plaintiff is somewhat speculative, the Federal Circuit recently held that the proper time for a protest against the terms of the solicitation is before the bids or proposals are submitted. Blue and Gold Fleet, L.P. v. United States, 492 F.3d 1308,1313 (Fed.Cir. 2007) Consequently, if Plaintiff were required to wait until it could show a non-speculative harm after award, it would lose its right to protest the terms of the solicitation. As the Court recently held, the only time for a party to bring a protest of the terms of a solicitation is before proposals are due, as Plaintiff here has done, and the only remedy

that will satisfy the protest is for the Court to enter injunctive relief. Weeks Marine, Inc. v. United States, 2007 WL 3277260, Fed.Cl., November 06, 2007.

Furthermore, the Plaintiff will suffer irreparable harm if an injunction is not granted because of the potential loss of valuable business that it could otherwise obtain under the required procurement procedures. This type of loss, deriving from a lost opportunity to compete in a fair competitive process for a contract, has been found sufficient to prove irreparable harm. Overstreet Electric Co. v. U.S., 47 Fed.Cl. 728 (2000); United Int'l Investigative Servs., Inc. v. United States, 41 Fed.Cl. 312, 323 (1998).

The loss of contract awards that the Plaintiff would have received under stand alone procurements mandated by the law and applicable regulations will be unavoidable if an injunction is not issued and if the Defendant is permitted to proceed. If an injunction is not issued, Plaintiff will be denied the benefit of a legally valid procurement process as well as a fair opportunity to compete.

**G. The Balance of Hardships Decidedly Favor Plaintiff**

The Court must consider whether a preliminary injunction will substantially injure the other parties in the proceeding. As discussed above, if Plaintiff's request for injunctive relief is not granted, it will suffer the loss of an opportunity to fairly compete and to earn the profits associated with receiving contract awards. This outweighs any potential harm to the Corps of Engineers. As noted in the Court's General Order No. 38, the "Court's practice is to expedite protest cases to the greatest practical extent," and Plaintiff is prepared to agree to an expedited schedule for resolving this matter. See 28 U.S.C. §1491(b)(3) ("[i]n exercising jurisdiction under this subsection, the courts shall give due regard to . . . the need for expeditious resolution of the

action"). Given the Court's practice to expedite bid protests, it is unlikely that the Corps will suffer irreparable injury during the pendency of this litigation.

**H. Injunctive Relief Will Serve The Public Interest**

It is a well-settled principle that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring the Government to follow its procurement statutes and regulations. See United Int'l Investigative Services, Inc., v. U.S., 41 Fed. Cl. 312,323 (1998) holding that the "public has a strong interest in preserving the integrity of the procurement process"; Isratex, 25 Cl.Ct. at 231 (public interest served by requiring the government to "fairly and honestly" consider bids). The public interest is always served when the procurement procedures required by law and regulation are followed. Issuance of an injunction will serve the public interest by protecting the integrity of the competitive procurement process.

**CONCLUSION**

Plaintiff respectfully submits that the requested relief is urgently needed to maintain the status quo until the Court reaches a decision on the merits. Based on the foregoing facts and analysis, Plaintiff respectfully requests the Court to grant its motion.

Respectfully submitted ,

Dated: 2-18-08

Michael H. Payne, Esquire
Payne Hackenbracht & Sullivan
220 Commerce Dr., Suite 100
Ft. Washington, PA 19034
215-542-2777
215-542-2779(fax)
mhp@phslegal.com

Attorney of Record for
TYLER CONSTRUCTION GROUP

OF COUNSEL:

Joseph A. Hackenbracht, Esquire
Timothy A. Sullivan, Esquire
Payne Hackenbracht & Sullivan