IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TYLER CONSTRUCTION CO., | ) | |
| | ) | No. 08-94C |
| Plaintiff, | ) | (Judge Wiese) |
| | ) | |
| v. | ) | Contains Protected Information |
| | ) | To Be Disclosed Only In Accordance |
| THE UNITED STATES, | ) | With U.S. Court of Federal Claims |
| | ) | Protective Order |
| Defendant. | ) | |

DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND RESPONSE TO PLAINTIFF'S CROSS-MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

REGINALD T. BLADES, JR.
Assistant Director

DOUGLAS G. EDELSCHICK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L. Street, N.W.
Washington, DC 20530
Tel: (202) 353-9303

Attorneys for Defendant

OF COUNSEL:

Thomas J. Warren, CPT, JA
Office of the Chief Counsel
United States Army Corps of Engineers
441 G. St. N.W.
Washington, DC 20314

April 25, 2008

# TABLE OF CONTENTS


STATEMENT OF THE ISSUES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B. The Acquisition Strategy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

C. The Acquisition Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

D. The Solicitation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I. FEDERAL LAW AUTHORIZES THE USE OF IDIQ CONTACTS FOR ACQUISITIONS OF NEW BUILDING CONSTRUCTION. . . . . . . . . . . . . 9

II. THE CONSOLIDATION AND BUNDLING STATUES DO NOT APPLY TO THIS PROCUREMENT OF NEW CONSTRUCTION. . . . . . . . . . . . . . . . . . . . . 15

III. THE SOLICITATION IS REASONABLE, NOT ARBITRARY OR CAPRICIOUS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

A. The Administrative Record Demonstrates A Rational Basis For This Procurement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B. Tyler Mistakenly Asserts That IDIQ Construction Contracts Are Unprecedented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

C. Tyler Incorrectly Claims That The Solicitation Was Structured To Monopolize Construction Work And Exclude Small Business.. . . . . . . . . 23

D. The Corps Had A Rational Basis For Complying With The Small Business Compensation Demonstration Program. . . . . . . . . . . . . . . . . . . 28

E. The Consolidation Memo Is Based Upon Common Sense And Market Research, Not “Smoke And Mirrors”. . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**TABLE OF CONTENTS (cont.)**

F. Tyler's Assertion That The Solicitation Contains "Anomalies" Is Wrong. . . . . . . . . . 34

IV. TYLER IS NOT ENTITLED TO INJUNCTIVE OR DECLARATORY RELIEF. . . . . . . . . . 37

CONCLUSION. . . . . . . . . . 39

## TABLE OF AUTHORITIES

**Cases**


ABF Freight Sys., Inc. v. United States,
55 Fed. Cl. 392 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

A&D Fire Protection, Inc. v. United States,
72 Fed. Cl. 126 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 23

Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States,
56 Fed. Cl. 502 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Amoco Prod. Co. v. Vill. of Gambell, Alaska,
480 U.S. 531 (1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Avtel Servs., Inc. v. United States,
70 Fed. Cl. 173 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,
462 U.S. 87 (1983).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Bannum, Inc. v. United States,
404 F.3d 1346 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Banknote Corp. of Am. v. United States,
365 F.3d 1345 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 9, 18, 19, 34, 37

CSE Constr. Co. v. United States,
58 Fed. Cl. 230 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Data Monitor Sys. v. United States,
74 Fed. Cl. 66 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Gentex Corp. v. United States,
58 Fed. Cl. 634 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Honeywell, Inc. v. United States,
870 F.2d 644 (Fed. Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Impresa Construzioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 19, 34

**TABLE OF AUTHORITIES (cont.)**

J.C.N. Constr. Co. v. United States,
60 Fed. Cl. 400 (2004) . . . . . 12, 23

KSEND v. United States,
69 Fed. Cl. 103 (2005) . . . . . 38

OAO Corp. v. United States,
49 Fed. Cl. 478 (2001) . . . . . 37

PGBA, LLC v. United States,
389 F.3d 1219 (Fed. Cir. 2004) . . . . . 37

Precision Images, LLC v. United States,
79 Fed. Cl. 598 (2007) . . . . . 8

Record Steel & Constr., Inc. v. United States,
62 Fed. Cl. 508 (2004) . . . . . 22

Rhodes v. United States,
156 Ct. Cl. 31 (1962) . . . . . 28

Serco, Inc. v. United States,
No. 07-691C,
2008 U.S. Claims LEXIS 69,
2008 WL 623803 (Fed. Cl. March 3, 2008). . . . . . 35

Yakus v. United States,
321 U.S. 414 (1940). . . . . . 37

Xtra Lease, Inc. v.United States,
50 Fed. Cl. 612 (2001) . . . . . 18

**Statutes**

1 U.S.C. § 1 . . . . . 36

5 U.S.C. § 706(2)(A) . . . . . 7

10 U.S.C. § 2303(a) . . . . . 15

10 U.S.C. § 2304 . . . . . 15

**TABLE OF AUTHORITIES (cont.)**

10 U.S.C. § 2304a(b). . . . . . . . . . 34, 35

10 U.S.C. § 2305a(a). . . . . . . . . . 36

10 U.S.C. § 2382. . . . . . . . . . 15, 16, 18, 30

15 U.S.C. § 631. . . . . . . . . . 24

15 U.S.C. § 632(o). . . . . . . . . . 16, 17

15 U.S.C. § 633. . . . . . . . . . 16

15 U.S.C. § 644. . . . . . . . . . 16, 17, 18, 28

28 U.S.C. § 1491(b). . . . . . . . . . 7

**Regulations**

13 C.F.R. § 124.504(c)(1)(ii). . . . . . . . . . 17

48 C.F.R. § 1.102-4(e). . . . . . . . . . 9, 10, 12

48 C.F.R. § 1.602-2. . . . . . . . . . 18

48 C.F.R. § 2.101(b). . . . . . . . . . 10, 11, 12, 13, 37

48 C.F.R. § 16.000. . . . . . . . . . 10, 11

48 C.F.R. § 16.504. . . . . . . . . . 11, 13, 34, 35

48 C.F.R. § 16.505(a)(2). . . . . . . . . . 35

48 C.F.R. § 19.1005. . . . . . . . . . 28

48 C.F.R. § 19.1007. . . . . . . . . . 20, 28, 29

48 C.F.R. § 36.101(b). . . . . . . . . . 13

48 C.F.R. § 36.301(b)(1). . . . . . . . . . 36

**TABLE OF AUTHORITIES (cont.)**

48 C.F.R. § 36.303. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

48 C.F.R. § 204.7003(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**Other Authorities**

B&M Construction, Inc.,
No. SIZ-2006-06-05-40,
2006 SBA LEXIS 60, *2-3 (S.B.A. Off. Hr'g & Appeals Aug. 11, 2006). . . . . . . . . . . . 23

1152 Cong. Rec. S118 (Jan. 25, 2006) (Stmt. of Sen. Inouye) . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

H.R. Rep. No. 109-628 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 23

H.R. Rep. No. 110-111, pt 1 (2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

The Small Business Fairness in Contracting Act,
H.R. 1873, 110th Cong. (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Denise Farris, Checking Your Indefinite Delivery/Indefinite Quantity (IDIQ) IQ,
22 Fall Construction Law 24 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## MOTION

Pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC") and the Court's February 21, 2008 order, defendant respectfully requests that the Court grant the United States judgment upon the administrative record, deny plaintiff's cross-motion for judgment on the administrative record, and deny plaintiff's requests for permanent injunctive relief and declaratory relief. In support of our motion, and for our response to the cross-motion filed by plaintiff, Tyler Construction Company ("Tyler"), we rely upon the following brief.

## BRIEF

## STATEMENT OF THE ISSUES

1. Does Federal procurement law authorize the use of Indefinite Delivery, Indefinite Quantity ("IDIQ") contracts for acquisitions of new building construction? Yes.

2. Do the consolidation and bundling statutes, which apply to combinations of existing requirements, govern contracts for new construction, which is a new requirement? No.

3. Is the use of an IDIQ contract for this procurement arbitrary and capricious? No.

4. Is Tyler entitled to permanent injunctive or declaratory relief? No.

## STATEMENT OF THE CASE

Tyler filed this pre-award bid protest on February 19, 2008. Tyler challenges the legality of Solicitation Number W9126G-07-R-0122 (Oct. 30, 2007), as amended (the "Solicitation"), which requests proposals for the construction of barracks facilities in the Southeastern United States, primarily in Georgia. AR 1 (original solicitation); AR 5-13 (amendments 1-9).[1] Tyler requests that the Court issue a permanent injunction to prevent the United States Army Corps of

[1] We refer to the Administrative Record, filed March 4, 2008, as "AR [Tab No.], p. [Page No.]."



**Protected Information To Be Disclosed Only In Accordance**
**With U.S. Court Of Federal Claims Protective Order**

Engineers ("USACE" or the "Corps") from awarding a contract pursuant to the Solicitation. Pl. Memo. in Supp. of Mot. for J.A.R. (March 25, 2008) ("Pl. Br."). The merits of the protest are before the Court on cross-motions for judgment upon the administrative record. The Corps has agreed to refrain from making an award pursuant to the Solicitation until the Court resolves the pending cross-motions.

In late March 2008, the Corps issued Amendment 10 to the Solicitation "to clarify the solicitation, as amended, to remove any doubt that the Government's intent is to award a Multiple Award Task Order Contract (MATOC)" with "two or more contracts resulting from this solicitation." On April 24, 2008, the Court ordered that Tyler's arguments concerning single award task order contracts ("SATOCs") are deemed moot. E.g., Pl. Br. 3-4, 10-11, 34-35.

STATEMENT OF FACTS

The Solicitation is part of the Army's Military Construction ("MILCON") program. The Corps' strategy for executing the MILCON program, and its plan for acquiring barracks facilities in particular, are the foundation for the Solicitation and explain the contract method chosen.

A. Background

"[T]he Army is pursuing the most comprehensive transformation of its forces since the early years of World War II." AR 15, p. 4. "The transformation is intended to move the legacy force into a new modular, more expeditionary and more lethal entity capable of quickly responding to our nation's future threats." Id. The transformation initiative includes the Integrated Global Presence Basing Strategy (IGPBS), Army Modular Force (AMF), and Base Realignment and Closure (BRAC) actions. AR 15, p. 2.

On November 1, 2004, the Army requested that the Corps develop a "strategy and implementation plan" for construction in support of the transformation initiative. AR 15, p.171.



**Protected Information To Be Disclosed Only In Accordance**
**With U.S. Court Of Federal Claims Protective Order**

The Army's "overall objective" is "to establish, reuse/repurpose facilities with the minimum lead-time; leverage private industry standards and practices; and reduce acquisition/life cycle costs." AR 15, p.171. The Army suggested that the Corps should consider "innovative procurement methodologies;" "all available procurement vehicles to capitalize on economies of scale, standardization, and industrialization; maximizing "the use of design-build procurement vehicles and fast-track construction;" leveraging "standardization to limit time for preparation of requests for proposal, advertisement, and award of procurement with a goal of four months;" and establishing "radically reduced construction durations to provide for earlier beneficial occupancy." AR 15, p. 172.

The Corps formed three "Tiger Teams" in January 2005, including a "Standards and Criteria Team," a "Planning and Programming Team," and an "Acquisition and Execution Team." AR 15, p.15. Each team was "focused on streamlining traditional approaches so that USACE can execute the mission more efficiently and more effectively and meet this directive." Id. "The goal of these teams is to maximize efficiencies and to ensure standardized processes, while at the same time providing the maximum opportunities for small businesses to work as prime contractors, and utilize industry standards and best practices and non-traditional construction methods in order to achieve the mission at hand." Id.

The Corps also performed market research and conducted one nationwide forum, four regional forums, and one specialized forum with industry participants. AR 15, pp. 12, 67. "The purpose of these forums was to share the primary objectives of the Army's program and gain industry's perspective on how it would go about executing a program of this magnitude and in the time required to meet the Army's needs." Id. Industry comments emphasized the need for standardization and economies of scale:



**Protected Information To Be Disclosed Only In Accordance**
**With U.S. Court Of Federal Claims Protective Order**

> In order to achieve the quality, flexibility, adaptability, and sustainability, as well as the time and cost savings that the Government is wanting to achieve, industry told USACE that it had to open up its MILCON Program to multiple different types of construction methods that are available and utilized throughout the United States by private industry. Industry recommended that USACE utilize prototype models, establish long-term contracts for specific facility types, promote repeat business, expand construction type usage …, and industry standards and codes, … as well as best practices[,] and only keep those specialized requirements that are inherently necessary to the Military, especially for safety and security concerns.

AR 15, p. 13. The Corps prepared a National Market Research Report that discusses the results of market research and industry comments. AR 15, pp. 67-170.

B. The Acquisition Strategy

The planning efforts of the Corps culminated in the creation of a National Acquisition Strategy ("Acquisition Strategy"). AR 15. The Acquisition Strategy is "a flexible and scalable acquisition strategy composed of primarily local and regional contracts … to execute an estimated $40 to $45 billion dollar Military Construction (MILCON) Program." AR 15, p. 8. The Acquisition Strategy is designed to "ensure the Army has the facilities and infrastructure necessary to provide the combatant commanders with the requisite capabilities to achieve … strategic objectives." AR 15, p. 4.

The Corps developed the Acquisition Strategy in view of the Army's requirements and fiscal constraints. "The Army requires a minimum 20% reduction in cost and a minimum of 30% reduction in time to occupancy." AR 15, p. 13. "[I]f these minimum savings are not achieved, there may not be enough money programmed or available to provide the Army all the facilities it requires, nor will facilities be available in time." Id. Therefore, the Acquisition Strategy concludes that it is "essential" for the Corps to "achieve savings through the use of economies of scale":



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

> Because of the magnitude of the new construction that will occur under this program, economies of scale will result from effective procurement practices. … USACE will be able to obtain economies of scale through bulk purchases of materials and equipment, as well as labor savings from one contractor constructing the same facility type over and over and learning taking place over time. Metrics and measures will be put into place, monitored, and evaluated at least annually to ensure that cost and time savings goals are being met.

AR 15, p. 14.

The Corps divided the many facility types required for the MILCON program into two tiers. Tier I contains eleven types of "Mission Critical Facilities," such as barracks, and Tier II contains ten additional types of facilities. AR 15, p. 11. The Corps also created "Facility Type Design Centers," which develop, maintain, and update prototype model designs for each facility type, to achieve economies of scale. AR 15, p. 9-10. The design centers provide design models for the facility type and, as each project is executed, use lessons learned to refine the model design. AR 15, p. 10. The design centers collaborate with local Corps districts to site adapt the prototype models for each project. Id. "Efficiencies are then gained as a result of identifying industry best practices, the creation of standard designs, implementing lessons learned / suggested improvements, … and the utilization of the right acquisition / contracting tools." Id.

It is the responsibility of each district of the Corps to select a contract type, justify the selection, explain how it will meet cost and time savings, and state how a balance of economies of scale and small business utilization was achieved. AR 15, p. 53. The Corps identified six Tier I facility types, including headquarters office buildings, and nine Tier II facility types, that are likely to be suitable for small business competition or set-aside due to the number of facilities required and the ability of small businesses to meet the bonding requirements for each facility. AR 15, p. 36. District acquisition plans must "strike a balance between achieving economies of



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

scale and meeting small business and other socio-economic goals, as well as small-business considerations when unrestricted acquisitions are necessary." AR 15, p. 33.

C. The Acquisition Plan

The Corps' Fort Worth district ("SWF" or "Fort Worth") is responsible for awarding contracts for the construction of several facility types:

(i) Unaccompanied Enlisted Personnel Housing ("UEPH");

(ii) Barracks for Advanced Individual Training ("AIT"), Basic Training ("BT"), and Warrior in Transition ("WIT") facilities;

(iii) Central Issue Warehouses ("CIW"), and

(iv) General Purpose Warehouses ("GPW").

AR 24, p. 1. Fort Worth prepared an Acquisition Plan, which identifies all known requirements associated with these facility types and plans for the possibility of changes in mission requirements. AR 24, pp. 1-2.

The Acquisition Plan provides for over 20 percent of the contract dollars to be set aside to small business, including 100 percent of the contract dollars for CIW and GPW facilities, and 100 percent of the contract dollars for projects valued at less than $15 million. AR 24, p. 17-18, 30; AR 23, pp. 5-28. The Corps has issued many solicitations pursuant to the Acquisition Plan, including the Solicitation at issue here. AR 23, p. 1.

D. The Solicitation

The Solicitation requests proposals for the construction of barracks at AIT, BT, and WIT facilities in the Southeast Region, primarily at Fort Benning, Georgia. AR 13, p. 1. The contract is a MATOC with a base year, three option years, a minimum guarantee of $10,000, and an



**Protected Information To Be Disclosed Only In Accordance
With U.S. Court Of Federal Claims Protective Order**

estimated total capacity of $301 million. AR 10, pp. 2, 12; AR 13, p. 2. The minimum and maximum task orders are $15 million and $95 million, respectively. AR 10, p. 3.

The Solicitation includes a 252-page statement of work that details the Army's known requirements for barracks facilities. AR 1, pp. 108-359. The statement of work estimates that the Army requires one AIT barracks, five BT barracks, and an unspecified number of WIT barracks. AR 1, pp. 291, 319, 352. A typical task order for a barracks will have a value of $31.25 million and, as noted, the total of all orders cannot exceed $301 million. AR 10, p. 3.

The Solicitation states that proposals will be evaluated under a two phase design build process. AR 13, p. 3. In phase one, interested firms may attempt to demonstrate their capability to execute a design build construction IDIQ contract, and the Government will select no more than five firms to compete for the contract in phase two of the process. Id. In phase two, interested firms submit detailed price proposals and other information. Id. Interested firms may associate together as teams or joint ventures when submitting proposals. AR 13, p. 7.

The Government will award firm fixed price IDIQ contracts to firms whose proposals represent the overall best value, considering technical design quality, performance capability, and cost. AR 13, pp. 3, 26.

## STANDARD OF REVIEW

The Court possesses jurisdiction to entertain this pre-award bid protest pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1). The Administrative Procedure Act ("APA") supplies the standard of review for this bid protest. 28 U.S.C. § 1491(b)(4); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). The proper standard is whether the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); Banknote Corp. of Am. v. United States, 365



**Protected Information To Be Disclosed Only In Accordance
With U.S. Court Of Federal Claims Protective Order**

F.3d 1345, 1350 (Fed. Cir. 2004). The Court should not overturn the challenged decision unless "'(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" Banknote, 365 F.3d at 1351 (quoting Impresa, 238 F.3d at 1332).

"When a challenge is brought on the first ground, the test is 'whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the [protestor] … bears a heavy burden of showing that the award decision had no rational basis.'" Banknote, 365 F.3d at 1351 (quoting Impresa, 238 F.3d at 1332-33). The rational basis standard "recognizes a zone of acceptable results in each particular case and requires that the final decision reached by an agency is the result of a process that 'consider[s] the relevant factors' and is 'within the bounds of reasoned decision making.'" Precision Images, LLC v. United States, 79 Fed. Cl. 598, 615 (2007) (quoting, inter alia, Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 105 (1983)). "Where the court finds a reasonable basis for an agency's action, it 'stay[s] its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" Precision Images, 79 Fed. Cl. at 615 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989)).

"'When a challenge is brought on the second ground, the [protestor] … must show a clear and prejudicial violation of applicable statutes or regulations.'" Banknote, 365 F.3d at 1351 (quoting Impresa, 238 F.3d at 1333). "A protestor must satisfy both requirements – significant and prejudicial error – in order to succeed with a claim on the merits." Precision Images, 79 Fed. Cl. at 615 (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005)). To demonstrate prejudice, the protestor "must show that there was a substantial chance it would



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

have received the contract award absent the alleged error." Banknote, 365 F.3d at 1351 (citation omitted).

Tyler has correctly stated the standard of review for Rule 52.1 motions. Pl. Br. 14-15.

## ARGUMENT

Tyler's leading point is that IDIQ contracts may not be used for major construction projects, but Tyler is wrong as a matter of law. Argument § I. Next, Tyler claims that the Corps violated the consolidation and bundling statutes, but these provisions do not apply in this case. Id. § II. Tyler's arguments fail because the Corps followed the law and had a rational basis for selecting an IDIQ contract for this procurement. Id. § III. Tyler is not entitled to relief. Id. § IV.

### I. FEDERAL LAW AUTHORIZES THE USE OF IDIQ CONTRACTS FOR ACQUISITIONS OF NEW BUILDING CONSTRUCTION

Tyler's primary argument is that the solicitation is invalid on its face because IDIQ contracts are not authorized for use in procurements of large building construction. Pl. Br. 8-10, 16-37. As the theory goes, there is "absolutely no legal authority" for this procurement strategy and the Corps is implementing a "global overhaul" of procurement regulations without notice and comment. Id. at 16, 20. Tyler's argument misconstrues the role of innovation in Federal procurement law, proceeds from a faulty premise, and does not address the pertinent regulations.

There is no provision of law that prohibits the use of IDIQ contracts for major construction projects, and Tyler cites to none. In the absence of such a prohibition, the Federal Acquisition Regulation, or the "FAR," encourages innovation in the development of military procurement strategies to meet the challenges of the 21st century. 48 C.F.R. § 1.102-4(e). "The FAR outlines procurement policies and procedures that are used by members of the Acquisition Team." Id. "If a policy or procedure, or a particular strategy or practice, is in the best interest of the Government and is not specifically addressed in the FAR, nor prohibited by law …,



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

Government members of the Team should not assume it is prohibited." Id. "Rather, absence of direction should be interpreted as permitting the Team to innovate and use sound business judgment that is otherwise consistent with law and within the limits of their authority." Id. The Corps has made innovative use of existing regulations, discussed below, that permit the use of IDIQ contracts for construction.

Part 16 of the FAR "describes types of contracts that may be used in acquisitions." 48 C.F.R. § 16.000 (emphasis supplied).[2] To answer Tyler's legal challenge, we begin with definitions of key terms, such as "contracts" and "acquisitions," that are used in the FAR.

"Contracts" are defined as "a mutually binding legal relationship obligating the seller to furnish the supplies or services (including construction) and the buyer to pay for them." 48 C.F.R. § 2.101(b)(2).[3] "Acquisitions" are defined as "the acquiring … of supplies or services (including construction) …, whether the supplies or services are already in existence or must be created, developed, demonstrated, and evaluated." Id.[4] Hence, the terms "contracts" and

---

[2] 48 C.F.R. § 16.000 ("This part [16] describes types of contracts that may be used in acquisitions. It prescribes policies and procedures and provides guidance for selecting a contract type appropriate to the circumstances of the acquisition.").

[3] 48 C.F.R. § 2.101(b)(2) ("Contract means a mutually binding legal relationship obligating the seller to furnish the supplies or services (including construction) and the buyer to pay for them. It includes all types of commitments that obligate the Government to an expenditure of appropriated funds and that, except as otherwise authorized, are in writing. In addition to bilateral instruments, contracts include (but are not limited to) awards and notices of awards; job orders or task letters issued under basic ordering agreements; letter contracts; orders, such as purchase orders, under which the contract becomes effective by written acceptance or performance; and bilateral contract modifications. Contracts do not include grants and cooperative agreements covered by 31 U.S.C. 6301, et seq. For discussion of various types of contracts, see part 16.").

[4] 48 C.F.R. § 2.101(b)(2) ("'Acquisition' means the acquiring by contract with appropriated funds of supplies or services (including construction) by and for the use of the Federal Government through purchase or lease, whether the supplies or services are already in existence or must be created, developed, demonstrated, and evaluated.").



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

"acquisitions" expressly include procurements of "supplies or services (including construction)" that are not "already in existence" and must be "developed" and "created." Id.

"Construction," in turn, is defined broadly to include the "construction … of buildings, structures, or other real property." Id.[5] Accordingly, the FAR expressly authorizes the use of "contracts" in "acquisitions" for the "construction … of buildings" that must be "developed" and "created." Id. Put another way, the FAR authorizes design-build construction contracts.

The FAR does not require the Government to use any one particular type of contract for the procurement of new building construction. Part 16 of the FAR addresses the various "types of contracts that may be used in acquisitions." 48 C.F.R. § 16.000; see also 48 C.F.R. § 2.101(b)(2) (definition of "contract" states: "For discussion of various types of contracts, see part 16."). One of the authorized "types of contracts that may be used in acquisitions" is the IDIQ contract. 48 C.F.R. §§ 16.000 (emphasis supplied), 16.504 ("Indefinite-quantity contracts"). By incorporating the defined terms "contracts" and "acquisitions," part 16 authorizes the use of IDIQ "contracts" for "acquisitions" of new building construction. Tyler does not address these defined terms, and therefore, its drumbeat of criticism rings hollow.

Tyler's claim that construction may never be procured through the use of an IDIQ contract was considered and rejected by the Court in A&D Fire Protection, Inc. v. United States, 72 Fed. Cl. 126, 136 (2006) (post-award protest). In A&D Fire, the Court found nothing in

[5] 48 C.F.R. § 2.101(b)(2) ("Construction means construction, alteration, or repair (including dredging, excavating, and painting) of buildings, structures, or other real property. For purposes of this definition, the terms 'buildings, structures, or other real property' include, but are not limited to, improvements of all types, such as bridges, dams, plants, highways, parkways, streets, subways, tunnels, sewers, mains, power lines, cemeteries, pumping stations, railways, airport facilities, terminals, docks, piers, wharves, ways, lighthouses, buoys, jetties, breakwaters, levees, canals, and channels. Construction does not include the manufacture, production, furnishing, construction, alteration, repair, processing, or assembling of vessels, aircraft, or other kinds of personal property.").



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

either the FAR, Federal procurement statutes, or case law, that that would prevent the Government from "using supplies and services IDIQ contracts" to procure construction. A&D Fire, 72 Fed. Cl. at 136. The reasoning of A&D Fire is persuasive, especially in light of the FAR's stated goal of promoting government innovation in procurement contracts so long as there is no legal prohibition. See 48 C.F.R. § 1.102-4(e).

In another recent bid protest involving an IDIQ construction contract, the Court found "no significant error in the procurement at issue that would provide a ground for relief." J.C.N. Constr. Co. v. United States, 60 Fed. Cl. 400, 413 (2004) (post-award protest). In J.C.N., the solicitation described a procurement of "new construction, alterations, renovations, maintenance, repairs, demolition, and design/build projects at federal installations in Maine, Vermont, and New Hampshire …." J.C.N. Constr. Co., No. B-293063, 2004 U.S. Comp. Gen. LEXIS 6 (Jan. 9, 2004). "A significant number of projects were to include design/build tasks. Projects were anticipated to have an estimated cost of between $ 25,000 and $ 1.7 million, with a maximum of $ 30 million for all projects ordered during the contract performance period." Id. The Court's decisions in J.C.N. and A&D Fire, when read together, demonstrate that the use of IDIQ contracts for new construction projects does not violate Federal procurement law.

Tyler, nevertheless, argues that A&D Fire and the cases cited therein did not involve construction services precisely like the one at issue here. Pl. Br. 36-37. The FAR, however, does not draw any fine distinctions between various types of construction services, such that the validity of any particular amount or type of construction service would depend upon the vagaries of litigation. 48 C.F.R. § 2.101(b)(2) ("construction means construction, alteration, or repair … of buildings, structures, or other real property"). Rather, the FAR indicates that contracts for construction services should be treated just like contracts for other types of services.



**Protected Information To Be Disclosed Only In Accordance**
**With U.S. Court Of Federal Claims Protective Order**

Part 36 of the FAR states: "Construction … contracts are subject to the requirements in other parts of this regulation." 48 C.F.R. § 36.101(a). Only "[w]hen a requirement in this part [36] is inconsistent with a requirement in another part of this regulation," then "this part 36 shall take precedence if the acquisition of construction … services is involved." 48 C.F.R. § 36.101(b). There is nothing in FAR part 36 that requires construction services to be treated differently from other forms of services, which may be procured through IDIQ contracts, see 48 C.F.R. § 16.504(a). Hence, Tyler's argument (Pl. Br. 11, 21-26) that FAR 16.504 refers to "services" and does not refer to "construction" misses the point because, as noted, construction "services" are subject to the same requirements as other "services" by virtue of FAR 36.101(a). In any event, as noted, the definitions section of the FAR twice refers to "construction" as a concept that is included within the ambit of the term "services." 48 C.F.R. § 2.101(b)(2) (definitions of "Acquisitions" and "Contracts" refer to "services (including construction)").

Tyler asserts further that "the Administrative Record twice takes positions that would disagree with the use of IDIQ … contracts for major construction policies." Pl. Br. 22. The two documents cited in the administrative record do not support Tyler's assertion.

First, Tyler makes the following claim: "In August 2005, for example, while developing the National Acquisition Strategy, … Defendant concluded squarely that 'construction per the FAR does not fit within the definitions of either a supply or service' and that 'construction is not a service.'" Pl. Br. 22 (quoting AR 53, p. 12, 14). The Corps made no such conclusion. The cited document, a powerpoint presentation that is dated over two years before the Corps issued the Solicitation, takes the position that approval of an Acquisition Plan should not be required because, as Tyler argues here, "construction" does not fit within the FAR definition of a "service." AR 53, pp. 12, 14. The presentation noted, however, that this position "appears to



**Protected Information To Be Disclosed Only In Accordance**
**With U.S. Court Of Federal Claims Protective Order**

conflict" with a legal "interpretation of construction versus services" that was provided by the agency's Office of Legal Counsel. AR 53, p. 10. The view expressed by the Office of Legal Counsel ultimately prevailed because the Fort Worth district sought and obtained approval of the Acquisition Plan in 2007. See AR 15, p. 177. The presentation shows that there was consideration and internal debate within the Corps concerning the argument raised by Tyler, but the debate was not concluded as Tyler suggests. In any event, this is a legal question and the Corps' interpretation is not binding upon the Court.

Second, Tyler asserts that the administrative record includes "a document that flatly contradicts its assumption that IDIQ contracting procedures may be applied to major contracts." Pl. Br. 9 (discussing AR 30, p. 2). According to Tyler, this document describes IDIQ contracts "as being limited to minor construction, maintenance and repair services." Pl. Br. 22-23 (same). The actual document, however, does not purport to "limit" anything. The document, a memo dated July 1997, states that IDIQ "contracts are used for obtaining installation support for minor construction and/or maintenance and repair construction and services associated therewith …." AR 30, p. 2. The 1997 memo provides historical perspective on the use of IDIQ contracts. In 1997, the memo reflects that IDIQ contracts were being used for the purposes listed. Subsequent innovations, however, led to the use of IDIQ contracts for procurements of new construction. See AR 15, 24; 1152 Cong. Rec. S118 (Jan. 25, 2006) (Stmt. of Sen. Inouye) (describing "construction [IDIQ] contracts" as a "pioneering design and procurement tool"). There is nothing in the 1997 memo that prohibits the Corps from engaging in lawful innovation.

Finally, Tyler argues that Congress "never intended," "contemplated," or "imagined" that IDIQ contracts could be used for major construction projects. Pl. Br. 9, 23, 26. Tyler fails to cite any evidence, however, about what Congress actually intended. We are not aware of any



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

legislative history on point. Congress is aware that IDIQ contracts are being used for major construction projects, however, and has not taken any action to ban the practice. See H.R. Rep. No. 109-628, at 1-2 (2006) (discussing how IDIQ construction contract for new entrance stations, bridge improvements, and new wastewater treatment plant at Grand Canyon National Park "benefited thousands of tourists who visit the Park each year"); 1152 Cong. Rec. S118 (Jan. 25, 2006) (Stmt. of Sen. Inouye) (discussing "construction [IDIQ] contracts"). We also doubt that Congress intended absurd results. If, as Tyler suggests, major construction projects are not a "service," then the entire $45 billion MILCON program would not be subject to the "full and open competition" requirement. See 10 U.S.C. § 2304 (the "head of the agency in conducting a procurement for property or services shall obtain full and open competition through the use of competitive procedures"); see also 10 U.S.C. § 2303(a) ("This chapter applies to the procurement . . . of all property (other than land) and all services for which payment is to be made from appropriated funds").

For these reasons, the Solicitation is consistent with existing procurement regulations and Tyler has failed to show a clear violation of law.

## II. THE CONSOLIDATION AND BUNDLING STATUTES DO NOT APPLY TO THIS PROCUREMENT OF NEW CONSTRUCTION

Tyler has argued that the Corps violated the consolidation and bundling provisions that appear in 10 U.S.C. § 2382(b) and 15 U.S.C. § 644(e), respectively. Tyler's complaint and preliminary injunction motion focused upon the issue of bundling. Tyler's motion for judgment concentrates upon consolidation, but still refers to bundling from time to time. The consolidation and bundling statutes animate the same small business policies, use virtually the same language, and express the same limitation that certain combinations of existing requirements must be



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

"necessary and justified." See 10 U.S.C. § 2382(b)-(c); 15 U.S.C. §§ 632(o), 644(e). These two statutes, however, do not apply to new construction, which is a new requirement.

The consolidation and bundling statutes, by their terms, apply only to contracts that would combine existing requirements, previously provided, under separate smaller contracts. 15 U.S.C. § 632(o) ("The term 'bundling of contract requirements' means consolidating 2 or more procurement requirements for goods or services previously provided or performed under separate smaller contracts …") (emphasis supplied); 10 U.S.C. § 2382(c)(1) ("The terms 'consolidation of contract requirements' and 'consolidation' … mean a use of a solicitation to obtain offers for a single contract or multiple award contract to satisfy two or more requirements … for goods or services that have previously been provided … under two or more separate contracts smaller in cost …") (emphasis supplied). A contract to design and build a new building, a barracks facility that will rise from the ground where none existed before, is a new requirement, not an existing one. Therefore, the Solicitation is not subject to the bundling and consolidation statutes.

The question of whether the bundling and consolidation statutes apply to construction contracts appears to be a matter of first impression for the Court. We are not aware of any bid protest decision that interprets the "previously provided" element in the context of bundling, and we are not aware of any bid protest decision that interprets the consolidation provisions. In addition to the plain language of the statutes discussed above, however, there is regulatory and legislative activity that confirms these statutes do not apply to new construction.

The United States Small Business Administration ("SBA") has interpreted the "previously provided" concept as it relates to construction contracts. The SBA, the agency charged with the protection of small business concerns, 15 U.S.C. § 633, has acknowledged in its formal regulations that "[c]onstruction contracts, by their very nature (e.g., the building of a



**Protected Information To Be Disclosed Only In Accordance
With U.S. Court Of Federal Claims Protective Order**

specific structure), are deemed new requirements." 13 C.F.R. § 124.504(c)(1)(ii)(B). "A new requirement is one which has not been previously procured by the relevant procuring activity." 13 C.F.R. § 124.504(c)(1)(ii). According to the SBA's reasoning, new construction contracts, by their very nature, cannot be a "consolidation" or "bundling" of existing requirements.

The SBA's interpretation of "previously provided" is confirmed by legislative activity in Congress. On May 11, 2007, the United States House of Representatives passed The Small Business Fairness in Contracting Act, H.R. 1873, 110th Cong. (2007). The bill, which is pending in the Senate, would expand the definition of bundling in 15 U.S.C. § 632(o) and include combinations of "requirements for construction services of a type historically performed under separate smaller contracts." H.R. 1873 § 101. According to the House report, this change in the law would "add[] construction services to those contracts that are subject to a bundling analysis mandated by 15(e) [15 U.S.C. 644(e)] of the Small Business Act." H.R. Rep. No. 110-111, pt. 1, at 6-7 (2007). The House Committee on Small Business explained: "Under the current definition, a contract may only be considered bundled if it has been previously performed. This provision expands the definition to include construction and other new work." Id. at 15. There would be no need for the House of Representatives to pass H.R. 1873 if the bundling or consolidation statutes already applied to contracts for new building construction.

Finally, Tyler mistakenly argues that "the Administrative Record appears to concede" that the Solicitation is subject to the consolidation statute. Pl. Br. 42. In the absence of judicial precedent, and in an abundance of caution, the Corps undertook the burden of complying with the consolidation statute, rather than assume the risk that an incorrect legal interpretation might derail this vital military procurement. See, e.g., AR 15, 24. As a matter of administrative


**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

prudence, the Corps prefers to do more than the law requires until the Court has an opportunity to rule upon this issue of first impression and national importance.

For these reasons, the bundling and consolidation statutes do not apply to contracts for new construction. Accordingly, there can be no violation of these provisions.

If, however, the Court finds that the consolidation statute applies to new construction requirements, then the Court should determine whether the Corps had a "rational basis" for finding that the combination of multiple barracks requirements in a single IDIQ contract was "necessary and justified." AR 15, p. 264; 10 U.S.C. § 2382(b)(1)(c); 15 U.S.C. § 644(e)(2)(A). For all of the same reasons discussed in Argument section III, and as detailed further in the Acquisition Strategy (AR 15, pp. 2-170), the Acquisition Plan (AR 24), and the Consolidation Memo (AR 15, pp. 246-64), the Corps had a rational basis for this finding.

## III. THE SOLICIATION IS REASONABLE, NOT ARBITRARY OR CAPRICIOUS

Tyler argues that the Solicitation is arbitrary and capricious because an IDIQ contract is "impractical" and "ill-suited" for this procurement of new construction. Pl. Br. 8, 26-31. The legal issue for the Court, however, is whether the Corps had a "rational basis" for its selection of the IDIQ contract method. See Banknote, 365 F.3d at 1351.

"The law is well-settled that the determination of an agency's procurement needs and the best method for accommodating them are matters primarily within the agency's discretion." See, e.g., ABF Freight Sys., Inc. v. United States, 55 Fed. Cl. 392, 409 n.13 (2003) (citing Xtra Lease, Inc. v. United States, 50 Fed. Cl. 612, 624 (2001)); accord Data Monitor Sys. v. United States, 74 Fed. Cl. 66, 73 (2006) (Wiese, J.) ("the agency has wide discretion with respect to the manner in which it conducts its procurements"); 48 C.F.R. § 1.602-2 ("Contracting officers are responsible for ensuring performance of all necessary actions for effective contracting, ensuring compliance with the terms of the contract, and safeguarding the interests of the United States in its



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

contractual relationships. In order to perform these responsibilities, contracting officers should be allowed wide latitude to exercise business judgment."). Tyler "bears a heavy burden of showing that" the selection of the IDIQ contract method "had no rational basis." Banknote, 365 F.3d at 1351 (quoting Impresa, 238 F.3d at 1332-33).

A. The Administrative Record Demonstrates A Rational Basis For This Procurement

The Solicitation pertains to a procurement of barracks at AIT, BT, and WIT facilities pursuant to an IDIQ contract with MATOC features. AR 1, 5-13. The administrative record discusses the Army's requirements, the strategy for this procurement, and the rationale for the contract method chosen. In particular, the National Acquisition Strategy (AR 15) and the Fort Worth Acquisition Plan (AR 24) contain a detailed discussion of these issues and establish that the Corps has a rational, even compelling, basis for this procurement.

"The decision on the acquisition plan for a specific project begins with examining whether significant economies of scale can be achieved by a 'facility type' contract." AR 24, pp. 18-19. AIT and BT facilities house soldiers temporarily while they are in training, and also provide laundry facilities, classrooms, and other amenities. AR 24, p. 19. WIT facilities house soldiers temporarily while they are recuperating from injuries sustained during their service in the United States and overseas and also provide administrative facilities and soldier family assistance centers. Id. The Corps "grouped together" barracks for AIT, BT, and WIT facilities into a single facility type "because of their similar design components," and in view of the "number of facilities to be built across the nation in the next five years." Id.

The administrative and training buildings at AIT, BT, and WIT facilities could have been built as part of integrated barracks buildings; however, Fort Worth is procuring these projects separately using set-aside contracts to create $93 million worth of additional opportunities for



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

small business. AR 24, p. 19-20, 34-36; AR 23, pp. 18-21. The barracks, however, "even when awarded as a single, stand-alone contract is not susceptible to set-aside because research has shown that small business firms within the authorized set-aside categories do not have the bonding or the experience to compete." AR 24, p. 17. "Contracts for small business set-aside for other small businesses," such as Tyler, "that likely have the bonding and experience are not allowed by regulation due to the Small Business Competitive Demonstration Program." See id.; see also 48 C.F.R. 19.1007(b) (restricting set-asides to small businesses that qualify under 8(a), HUBZone, and Service Disabled Veteran Owned Business programs).

Fort Worth considered a number of possible approaches for acquiring barracks facilities, including the use of (i) one contract for each facility (as Tyler prefers); (ii) a single nationwide contract for each facility type; or (iii) regional contracts for a facility type. AR 24, pp. 24-28. The Acquisition Plan discusses the pros and cons of each approach and concludes that the regional approach strikes the best balance between competing interests, including the need to achieve economies of scale, the desire to promote competition, and the goal of promoting small business. Id.; see also AR 15, pp. 47-50 (outlining pros and cons of potential acquisition approaches and suggesting that districts look for "opportunities" to use one contract "per Facility Type per Region"). Fort Worth made this determination after conducting additional market research. AR 24, pp. 11-18. The national market research also asked, "as a SB [Small Business] are you able to successfully perform on construction projects on a regional basis?" AR 15, p. 127. Virtually every small business contractor answered, "Yes." AR 15, p. 127.

Fort Worth also considered the most appropriate contract method for this procurement of barracks. AR 24, pp. 20-21. The Army's requirements include nine barracks facilities in the Southeast region, seven of which are located in Georgia. AR 23, p. 16; see also AR 24, p. 11



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

(United States map showing the four geographic regions). The average estimated cost of these barracks is approximately $30 million. AR 23, p. 16. The Acquisition Plan explains that IDIQ contracts are critical to reduce costs and to ensure technical continuity:

> [T]he exercise of best business judgment confirms that the utilization of Indefinite Delivery Contracts continues to be appropriate and necessary to the execution of the plan.
>
> IDIQ acquisition strategies are necessary: to reduce the cost and time required to procure the required construction services through normal selection procedures (e.g. cost and time savings anticipated from reduced acquisition milestones by using the acquisition tools noted under this plan amendment, and additional cost and time savings anticipated by adapting industry design and construction standards, as noted under the Army Transformation Initiatives); to ensure the technical continuity among related requirements (e.g., continuous build approach for specific facility types at specific locations); and to lessen the potential construction and contract management risks associated with having more than one contractor on an installation (e.g., unacceptable administration delays in such areas as coordination and movement of work forces and equipment, separation and acceptance of contractor responsibility, and verification of performance and progress).

AR 24, p. 21.

Fort Worth further concludes that the "use of SATOC or MATOC complimented at times through the utilization of C-Type contracts is necessary to the successful implementation of this acquisition plan …." AR 24, p. 21; see also AR 24, p. 6 (reviewing benefits of SATOC and MATOC features); 48 C.F.R. § 204.7003(a)(3) ("C" type contract means "contracts of all types except indefinite delivery contracts, facilities contracts, sales contracts, and contracts placed with or through other Government departments or agencies or against contracts placed by such departments or agencies outside the DoD"). The Acquisition Plan explains that, to "achieve cost and learning curve efficiencies," each contractor should "have at least three projects spread over more than one program year." AR 24, p. 21. Fort Worth generally structures contacts based upon the number of projects in a region for the facility type. Id. Fort Worth typically selects a



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

SATOC if there are at least three projects, and a MATOC if there are at least six projects. Id. Fort Worth does not use an IDIQ contract, however, and instead selects a C-Type contract, if there are only one or two projects in a region for the facility type. Id.; see also AR 24, p.3 (chart listing estimated number of projects for each region and each facility type, along with contract method utilized).

The Solicitation is the result of several years of research, analysis, and deliberation. The administrative record demonstrates that the Corps had a rational basis for grouping AIT, BT, and WIT barracks together as a single facility type, for procuring these barracks using a regional contracting approach, and for selecting the IDIQ contract method with multiple task orders.

B. Tyler Mistakenly Asserts That IDIQ Construction Contracts Are Unprecedented

Tyler incorrectly argues that the Corps has made an unprecedented use of an IDIQ contract for this procurement. The Corps has made increasing use of IDIQ contracts for construction during the past ten years. In July 1997, the Corps noted that IDIQ contracts were being "used for obtaining installation support for minor construction and/or maintenance and repair construction …." AR Tab 30, p. 2. In November 1997, the Corps distributed a memo that encouraged contracting officers to make "smart use" of IDIQ contracts in new and "better ways." AR Tab. 31, pp. 1-2. The memo noted that the use of IDIQ "contracts in all of their various forms has exploded across the Federal government in the last few years, and for good reason – their use generally results in reduced procurement administrative lead-times and delivery schedules, lower contract costs, and a more efficient use of trained acquisition and requirements personnel." Id. In the past decade, IDIQ contracts have become a common fixture in procurements of new construction. See, e.g., Record Steel & Constr., Inc. v. United States, 62 Fed. Cl. 508, 510 (2004) (discussing large IDIQ contract for design/build construction of



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

dormitory and other buildings on Air Force bases in 14 state area); J.C.N. Constr. Co. v. United States, 60 Fed. Cl. 400, 401 (2004) (discussing $30 million IDIQ contract for design build construction and other construction services at Naval installations in three state area); B&M Construction, Inc., No. SIZ-2006-06-05-40, 2006 SBA LEXIS 60, *2-3 (S.B.A. Off. Hr'g & Appeals Aug. 11, 2006) (discussing $60 million IDIQ contract for "a wide variety of construction features to include but not be limited to: highway work, heavy construction work, building construction," at "various locations in Colorado"); H.R. Rep. No. 109-628, at 1-2 (2006) (discussing IDIQ construction contract over $10 million for new entrance stations, bridge improvements, and new wastewater treatment plant at Grand Canyon National Park); see also A&D Fire, 72 Fed. Cl. at 136 ("The federal government was already using IDIQ contracts in the construction arena by the time FASA was passed.") (citing Denise Farris, Checking Your Indefinite Delivery/Indefinite Quantity (IDIQ) IQ, 22 Fall Construction Law 24 (2002) ("ID[IQ] contracts have been used routinely and effectively by the [the United States Department of Defense] for installation maintenance, minor repair, and construction projects since [IDIQ's] inception in 1981.")).

C. Tyler Incorrectly Claims That The Solicitation Was Structured To Monopolize Construction Work And Exclude Small Business

Tyler asserts that the Solicitation would "monopolize the [A]rmy's entire construction program in a whole quadrant of the country for a three year term." Pl. Br. 20. The Solicitation, however, pertains to a procurement of barracks at nine BT, AIT, and WIT facilities in two Southeastern states (Georgia and Kentucky). AR 1, 5-13; AR 23, p. 16. The Corps is procuring barracks at four AIT, BT, and WIT facilities elsewhere in the Southeast region, including in Tyler's home state of South Carolina and in North Carolina. AR 23, p. 16. The Corps has also issued solicitations for approximately 50 other projects in the Southeast region, and this number



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

includes only the facility types assigned to the Fort Worth District. AR 24, p. 3. The Solicitation totals $300 million, but represents less than one percent of a $45 billion program. AR 10, p. 3; AR 15, p. 8. The Solicitation will not create a construction "monopoly" in the Southeast region.

Tyler claims that "the solicitation has been structured to virtually exclude small business from competition," and "the Corps has not given realistic or appropriate consideration to the ability of small business to compete for the required work …." Pl. Br. 12; but see Pl. Br. 44-45 (discussing some, but not all, of the evidence in the administrative record showing efforts by the Corps to accommodate the interests of small business). The administrative record contains substantial, if not overwhelming, evidence that refutes Tyler's claim. From the very earliest planning stages, to the issuance of the Solicitation, and even up to the present, the Corps has honored the small business policies embodied in Federal law. See, e.g., 15 U.S.C. § 631(a), (j).

In March 2005, the Corps determined that acquisition planning for the MILCON program will require consideration of small business goals; the effect on small business; the need to encourage small businesses to enter into joint ventures or other commercial teaming arrangements in order to compete for larger procurements; and the requirement that large businesses "exceed the minimum USACE goals by placing significant emphasis on subcontracting or teaming." AR 35, p. 12; AR 36, p. 11.

In April 2005, the Corps began conducting a series of industry forums around the United States focusing upon the MILCON program and potential ramifications for small business. AR 38-46. The Corps emphasized that it was "serious" about small business. AR 38, p. 30; AR 39, pp. 46-53. The Corps informed small business attendees that their input was critical and recommended that they prepare in advance for large procurements through joint ventures or similar arrangements. AR 38, p. 29; AR 56, p. 10. The Corps also provided attendees with



**Protected Information To Be Disclosed Only In Accordance
With U.S. Court Of Federal Claims Protective Order**

information concerning potential set-asides and stated that large business awardees would be required to have a small business subcontracting plan in place. AR 38, p. 32.

In early 2006, the Corps reiterated its commitment to "Continue to meet Army/DOD Small Business requirements" during the MILCON Transformation process. AR 58, pp. 12, 20. The Corps instructed its design centers to "[g]roup projects smartly to allow for a balance between" economies of scale, utilization of small businesses as prime contractors, and utilization of small business preference programs. AR 64, p. 3. The Corps encouraged small business to participate in the development of regional acquisition plans for each design center. AR 58, p. 21.

The Corps held four regional "Industry Day" programs and conducted nationwide market research. AR 89, p. 1; AR 94, pp. 1-2; AR 97 p. 32. The Industry Day programs were well attended by representatives of small business. For example, approximately 170 representatives of contracting and business firms attended the July 31, 2006 forum, and 53 of the attendees identified themselves as representing a small business. AR 98, pp. 1-9. The Corps provided an assessment of its small business program at the time:

> The Corps … has a very successful small business program. [I]t's a major contributor to the overall success of the Army small business program. [T]he Corps of Engineers and the Army Material command … award the largest amount of dollars to all business firms and to small business firms in particular. … [I]n '05 the Army awarded about $70 billion … to all business firms … [a]nd … small businesses received about $20 billion … for direct contracts … not sub contracts.

AR 97, pp. 43-44; accord AR 97, pp. 45-48. At another Industry Day, the Corps reiterated that it has "a goal to make for small business prime contract awards, … and based on the market research that we have we'll determine how many contracts that we can set aside and what types those will be set aside for." AR 113, pp. 64-65. The Corps hosted a market research website for



**Protected Information To Be Disclosed Only In Accordance**
**With U.S. Court Of Federal Claims Protective Order**

contractor surveys. Approximately 249 contractors used the website and approximately 200 contractors completed the survey by September 2006. AR 125, p. 9; AR 127, p. 7.

One of the "recommendations" from industry to "mak[e] the [MILCON Transformation] program Small Business friendly" was to "[u]se Indefinite Delivery/Indefinite Quantity type contracts so that the Task Orders issued against that contract are able to be bonded separately versus having to bond one huge contract that would possibly be over the bonding limit of the Small Business." AR 15, p. 74; see also AR 15, p. 80 ("[u]se of Task Orders under the ID/IQ Contract will likely allow Small Business to compete"). A similar industry suggestion was to "Award Multiple Award ID/IQ Contracts that will support a region and all installations in that region." AR 15, p. 80; see also AR 15, p. 152 ("consider use of MATOCs to perform the work …" and "award regional contracts for the facilities and different types of construction requirements could then be adapted suitable to those … regions").

The Corps conducted "extensive" market research concerning the capabilities of small business firms that were eligible to receive set-aside contracts as part of the Small Business Competitive Demonstration Program. AR 24, p. 11-18, 42; AR 15, pp. 67-170, 312-54; AR 16-22. The Acquisition Strategy recommends that the Corps "package projects 'smartly' in order to achieve a balance between economies of scale and small business utilization." AR 15, p. 2. The Acquisition Plan, in turn, provides for over 20 percent of the contract dollars to be set aside to small business, including 100 percent of the contract dollars for CIW and GPW facilities, and 100 percent of the contract dollars for projects valued at less than $15 million. AR 24, p. 17-18, 30; AR 23, pp. 5-28. The Small Business Administration reviewed and approved the Solicitation based upon the Corps' market research and the Acquisition Plan. AR 15, p. 302.



**Protected Information To Be Disclosed Only In Accordance**
**With U.S. Court Of Federal Claims Protective Order**

Even though the Corps found that barracks construction work of this magnitude has "not been performed previously by small business[,]" AR 24, pp. 28-29, the Corps still looked for ways to encourage small businesses to participate. The Solicitation includes approximately 69 references to small business, various classes of small business, and issues affecting small business. AR 1. For example, Section 002100, Subparagraph 1.13 establishes "reasonable and achievable" subcontracting goals for the utilization of small business concerns, including a goal that 51.2 percent of subcontracted work should be performed by small business. AR 1, p. 15. The Solicitation further provides: "All offerors (both large and small businesses) will be evaluated on the level of small business commitment they demonstrate for the proposed acquisition, and their prior level of commitment to utilizing small businesses in performance of prior contracts." AR 1, p. 69; accord AR 13, pp. 39-40.

After the Solicitation was issued, the Fort Worth district updated its small business research and analysis. Tab 24. Fort Worth continued to assess its requirements, and when it determined that administrative headquarters buildings ("HQs") were not essential to the barracks buildings, Fort Worth decided to create additional set aside opportunities for small business by issuing separate solicitations for the HQs. AR 23. Fort Worth proposed this change "to enhance competition even further and produce increased opportunities for small business." AR 25. The Corps approved Fort Worth's proposal because it "increased small business participation through set-aside solicitations for 8(a), SDVOSB and HUBZone business concerns." AR 26.

The Corps considered the interests of small business and made a reasonable, even extraordinary, effort to accommodate them in the Acquisition Strategy, the Acquisition Plan, and the Solicitation. In many cases, small businesses are serving as prime contractors. In other cases, small businesses may be limited to serving as subcontractors. The barracks contemplated



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

are too large for most small businesses to serve as the prime contractor. As noted, barracks construction historically has "not been performed previously by small business[.]" AR 24, pp. 28-29. There is no provision of law that requires a Federal agency to place every single contract within the reach of small business. The Corps has taken reasonable steps to accommodate small business by removing the HQs from the ambit of the Solicitation and setting them aside for small business, by requiring small business subcontracting plans from potential offerors, and by setting aside to small business over 20 percent of the contract dollars pursuant to the Acquisition Plan.

D. The Corps Had A Rational Basis For Complying With The Small Business Compensation Demonstration Program

Tyler complains that it was an abuse of discretion for the Corps to comply with the Small Business Competitiveness Demonstration Program ("Competitiveness Demonstration Program") which, according to Tyler, imposes "unfair limitations." Pl. Br. 39-42, 56, 58; see also 15 U.S.C. § 644; 48 C.F.R. § 19.1007. Tyler's complaint should be addressed to Congress, which mandated that Federal agencies comply with the Competitiveness Demonstration Program.

The Competitiveness Demonstration Program provides that contracts in designated categories may not be set-aside to a small business, unless it qualifies as an 8(a), HUBZone, or Service Disabled Veteran-Owned small business. 48 C.F.R. §§ 19.1005, 19.1007(b). One of the designated categories pertains to building construction. See 48 C.F.R. § 19.1005. Tyler concedes that the Solicitation for barracks construction is subject to the Competitiveness Demonstration Program. Pl. Br. 39-40. The Corps cannot commit an abuse of discretion by complying with the Competitiveness Demonstration Program. See, e.g., Rhodes v. United States, 156 Ct. Cl. 31, 37 (1962) (agency action "could not be arbitrary, capricious or contrary to law … [s]ince all pertinent regulations were followed").



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

The Department of Defense ("DoD"), a Federal agency, does have discretion to reinstate set asides to general small businesses, such as Tyler, "as necessary to meet [the agency's] assigned goals, but only within organizational units that failed to meet the small business participation goal." FAR § 19.1007(b)(1). In the absence of a DoD reinstatement order, however, the Corps was bound to comply with the Competitiveness Demonstration Program, which limited "construction projects from being set-aside to small businesses, other than those in the Preference Program." AR 126, p. 14; accord AR 52, p. 18; AR 53, p. 5; AR 97, pp. 43-48.

Tyler does not suggest that the Corps, an organizational unit within the DoD, was not meeting its small business goals at the time. Even if we assume, however, for the sake of argument, that the Corps was not meeting its small business goals, the Corps still would have had a rational basis for not requesting a waiver in the particular case of this Solicitation. The Corps determined that, to "achieve cost and learning curve efficiencies," which are critical to success of the MILCON program, each contractor should "have at least three projects spread over more than one program year." AR 24, p. 21. These economies and efficiencies would have been lost if, as Tyler suggests, the Corps had sought a waiver of the Competitiveness Demonstration Program and had set aside a single barracks project to a general small business. Furthermore, it is unclear whether such a waiver would have been granted by DoD and, even if successfully obtained, whether it would have been productive because barracks construction of this magnitude has "not been performed previously by small business[.]" AR 24, pp. 28-29. The Corps did not abuse any discretion when it followed the law.

E. The Consolidation Memo Is Based Upon Common Sense And Market Research, Not "Smoke And Mirrors"

As noted above in Argument § II, the Corps prepared a Consolidation Memo (AR 15, pp. 246-64), acting in an abundance of caution, just in case the Court were to disagree with our



**Protected Information To Be Disclosed Only In Accordance
With U.S. Court Of Federal Claims Protective Order**

argument that the consolidation provisions in 10 U.S.C. § 2382 do not apply to this procurement of new building construction. The Consolidation Memo provides further evidence of the rational basis for this procurement.

The Consolidation Memo includes a finding that the combination of barracks requirements in the Solicitation is "necessary and justified." AR 15, p. 264. A combination of requirements is "necessary and justified" when "the benefits of the strategy substantially exceed the benefits of each of the possible alternative contracting approaches." 10 U.S.C. § 2382(2)(C). Benefits may include: (i) cost savings, (ii) quality improvements, (iii) reductions in acquisition cycle times, (iv) better terms and conditions, or (v) any other benefits. 10 U.S.C. § 2382(3)(A)-(D). The Consolidation Memo reviews numerous benefits in each of these areas, and concludes that the Corps "will not be able to meet the Army's goals of cost and time savings" without the combination of barracks requirements. AR 15, pp. 254, 262. The benefits cited by the Corps reflect common sense and good business judgment and find ample support in the administrative record.

Tyler, nevertheless, argues that the Consolidation Memo is "nothing more than smoke and mirrors." Pl. Br. 48. Tyler reviews many of the justifications that were cited by the Corps, along with some of the supporting case studies and data analyses, and then, Tyler quibbles with each one. Pl. Br. 48-55. We address each of Tyler's arguments in turn.

Tyler mistakenly argues that the Corps found barracks to be within the bonding limits of small business, quoting a sentence fragment in the Acquisition Plan. Pl. Br. 48 (quoting AR 24, p. 17). The full text of the quoted sentence states: "*In many cases*, the maximum contract values for [Tier 1] projects in these regions are well within contract and bonding limit for which other small businesses not included in the set-aside categories can compete, e.g. due to the



**Protected Information To Be Disclosed Only In Accordance**
**With U.S. Court Of Federal Claims Protective Order**

Competiveness Demonstration Program." AR 24, p. 17 (emphasis supplied). In fact, the Acquisition Plan provides for over 20 percent of the contract dollars to be set aside to small business, including 100 percent of the contract dollars for CIW and GPW facilities, and 100 percent of the contract dollars for projects valued at less than $15 million. AR 24, p. 17-18, 30; AR 23, pp. 5-28. As for barracks, however, the Corps found that construction on these larger facilities has "not been performed previously by small business." AR 24, pp. 28-29. Hence, the Acquisition Plan is consistent with the benefit cited in the Consolidation Memo that the procurement "[w]ill result in appropriately sized contracts that match the available business base." AR 15, p. 254.

Tyler also critiques the Corps' reliance upon its finding that "a minimum of three facilities" is "the optimum for achieving economy of scale benefits," when the Corps intends to acquire nine facilities pursuant to the Solicitation. Pl. Br. 49 (citing AR 15, p. 254). The Corps intends to award contracts to multiple contractors pursuant to the Solicitation. AR 10. Each contractor will perform approximately three or four projects out of the total of nine. This approach is consistent with the Corps' "minimum of three facilities" finding, which was developed based upon Government and industry experience. AR 15, pp. 39-53; AR 15, pp. 255-57; AR 24, p. 18-26. Tyler cites no evidence refuting either the concept of economies of scale or the Corps' finding.

Next, Tyler takes issue with several benefits associated with the "learning curve" concept. Pl. Br. 49-51. The Corps found lower costs would result from (i) "repetitive design as the contractor designs the facility the first time … then repeats for each subsequent facility," (ii) "reduced construction duration and improved quality, as the contractor and its crew and subcontractors benefit from lessons learned on previous facilities," and (iii) the potential for pre-



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

fabricated designs as one facility type is "replicated throughout the contract period." AR 15, p. 254. Tyler nitpicks that some subcontractors and some crew members might change from project to project, and a given project may require some degree of site adaptation. Pl. Br. 49-50. Even if true, the overall benefits still accrue when the same contractor and many of the same subcontractors and crew develop experience building and site-adapting the same barracks facilities again and again. Further, although Tyler observes that contractors are not contractually required to use pre-fabricated designs, Tyler admits that the Corps has encouraged offerors to utilize this time and money saving approach in their proposals. Pl. Br. 50-51.

Tyler also critiques the benefits cited by the Corps that relate to time savings. Pl. Br. 51-52. Tyler admits that IDIQ contracts will allow the Corps to save time, but makes a policy argument about whether those benefits outweigh the effect upon small business. Id. As noted above in Argument § III-B, the Corps adequately considered and addressed small business considerations in connection with this procurement. Tyler argues further that a savings of 45 days lead time for each project is not significant (Pl. Br. 51), but when multiplied over multiple projects and multiple years, the time savings increases exponentially. Tyler questions the Corps' finding that contractors pursuant to this IDIQ contract will have "continuous work" and the ability to move labor efficiently from one project to the next, reasoning that contractors are not entitled, as a matter of law, to any of the barracks projects pursuant to this IDIQ contract. Pl. Br. 51. As a practical matter, however, the Army requires nine barracks facilities, and the Corps intends to award the IDIQ contract to two or three contractors. With each contractor engaged in multiple building projects over the contract, the Corps reasonably anticipates time savings from the efficient use of labor resources as contractors move from one project to the next and from



**Protected Information To Be Disclosed Only In Accordance**
**With U.S. Court Of Federal Claims Protective Order**

having a pool of experienced contractors that are familiar with the Government's expectations in the approval process. AR 15, p. 254.

Finally, Tyler disagrees with the Corps' analysis of real world case studies and theoretical data. Pl. Br. 52-54. The Walmart, Kansas Air National Guard, and Fort Riley case studies demonstrate that, for large facilities, the Corps can achieve economies of scale, elimination of repetitive design costs, and efficiencies from the learning curve by using standard facility types that are grouped together in quantities as small as four. AR 15, pp. 255-56. In addition, the Walmart and Kansas Air National Guard studies show that cost and time savings may be achieved over large geographical areas, which supports a regional acquisition strategy. Id. The Corps also conducted "learning curve" and "design cost savings" analyses that further support these findings. Id. The case studies and data analyses, when considered together, show that the Corps engaged in a meaningful effort to research the best way to achieve the Army's mission objectives. The case studies and data analyses provide a sound and reasoned basis for the Corps' conclusion that the combination of barracks requirements in the Solicitation is necessary to achieve economies of scale, efficiencies and quality improvements, and time and cost savings. AR 15, p. 262. Without these benefits, the Corps concluded that it "will not be able to meet the Army goals of cost and time savings," and "will not be able to support the MILCON Transformation" and other stationing initiatives. Id.

Tyler, nevertheless, argues that the Walmart case study should be disregarded because "it is highly unlikely that a contractor with an IDIQ contract would pre-purchase materials for future task orders." Pl. Br. 52-53. Tyler offers no support for this assertion and misses the mark. Bulk purchases can be made for multiple projects taking place at the same time and multiple contractors can pool their orders with suppliers. Tyler argues further that the Kansas Air



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

National Guard case study is inapposite because it occurred during an emergency situation. Pl. Br. 52. Tyler provides no explanation as to why an emergency or non-emergency would make any difference, but in any event, the Army requires radically reduced acquisition times for this procurement, which is similar to an emergency situation. Finally, Tyler admits that the Fort Riley case study supports a "combination of four facilities into a single contract vehicle," but then, erroneously asserts that the Solicitation "is for one facility and there is no indication of … additional work." Pl. Br. 53-54. Earlier in its brief, however, Tyler admits that, to date, the Corps has identified "nine" "projects under the [S]olicitation that is the subject of this protest" with a "total value of about … $250,311,000." Pl. Br. 48.

For these reasons, the combination of barracks requirements in the Solicitation is reasonable, necessary, and justified by the numerous benefits cited and the extensive research reviewed in the Consolidation Memo. The Solicitation issued pursuant to the Acquisition Plan "strikes an appropriate balance of attaining the economies and efficiencies of time and cost through repeat business opportunities, learning curve, economies of bulk purchasing and increased quality through replication, while still supporting Federal, DoD, Army, and USACE procurement and socioeconomic objectives." AR 15, p. 263. Tyler has failed to carry its "heavy burden of showing that" the Corps' action "had no rational basis." Banknote, 365 F.3d at 1351 (quoting Impresa, 238 F.3d at 1332-33).

F. Tyler's Assertion That The Solicitation Contains "Anomalies" Is Wrong

Tyler makes a number of technical arguments about purported "anomalies" in the Solicitation, Pl. Br. 26-34, none of which have any merit.

Tyler argues that the Solicitation does not comply with 10 U.S.C. § 2304a(b)(2)-(3) and 48 C.F.R. § 16.504(a)(4)(ii)-(iii), which require a statement of "the total minimum and maximum



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

quantity of supplies or services the Government will acquire under the contract," and "a statement of work … that reasonably describes the general scope" of the project. Pl. Br. 27-34. Tyler has overlooked FAR section 16.504(a), which expressly provides that "quantity limits may be stated as number of units or as dollar values." 48 C.F.R § 16.504(a). The Solicitation sets forth minimum ($10,000) and maximum ($301 million) dollar values for the contract, as well as the dollar value for a typical task order ($31.25 million). AR 10, pp. 2-3, 12; AR 13, p. 2. Tyler also overlooks the 252-page Statement of Work, which appears in the Solicitation and outlines in detail the Army's requirements for barracks at AIT, BT, and WIT facilities. AR 1, pp. 108-359. Tyler suggests that potential offerors will have no idea where the work is to be performed, Pl. Br. 32, but the Solicitation states that the barracks primarily are required at Fort Benning. AR 1, p. 1; see also AR 23, p. 16 (five barracks located at Fort Benning, Georgia, two barracks located elsewhere in Georgia, and two located in Kentucky). The Solicitation provides a reasonable description of the work and complies with 10 U.S.C. § 2304a(b) and 48 C.F.R. § 16.504(a)(4).

Tyler argues further that the Corps has abandoned price as a meaningful consideration for this procurement because the Solicitation does not specify the "full costs or price" for each barracks facility, relying upon 48 C.F.R. § 16.505(a)(2) and Serco, Inc. v. United States, No. 07-691C, 2008 U.S. Claims LEXIS 69, 2008 WL 623803 (Fed. Cl. March 3, 2008). Pl. Br. 19-20, 28-32. Section 16.505(a)(2) proscribes the requisite level of detail – for individual task orders issued pursuant to an existing IDIQ contract – not for the Solicitation prior to a contract award. Section 16.505(a)(2), therefore, has no application in this case. 48 C.F.R. § 16.505(a)(2). The Court held in Serco, however, that the Government may not disregard price as an evaluation factor at the initial award stage, even if the Government anticipates price competition for individual task orders. Serco, 2008 WL 623803, *23-24 (post-award protest challenging


**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

reasonableness of the Government's analysis of price when it awarded IDIQ contract with MATOC features). The Solicitation states that the Corps will give appropriate consideration to price factors at the initial award stage. The Solicitation states that price "will be evaluated for fairness and reasonableness through the use of a price analysis." AR 1, p. 70; AR 13, p. 31. The Solicitation adds that the Corps will award the contract to offerors whose proposals are "fair and reasonable with regard to pricing for the initial task order, and … offer the best overall value to the Government, considering the price and non-price factors described herein." AR 1, p. 52; AR 13, p. 26. The Corps is considering price factors throughout the procurement process.[6] Tyler cannot legitimately claim otherwise.

Finally, Tyler argues that the Solicitation unlawfully utilizes two-stage selection procedures, citing 10 U.S.C. § 2305a(a). Pl. Br. 33-34. Section 2305a(a) relates to "design and construction of a public building, facility or work," and Tyler asserts that the Corps is not just procuring "a" barracks facility, it is procuring more than one. Id. Tyler's argument contravenes a basic canon of construction. "In determining the meaning of any Act of Congress, unless the context indicates otherwise – words importing the singular include and apply to several persons, parties, or things." 1 U.S.C. § 1. Tyler also cites 48 C.F.R. § 36.303, which states that "[o]ne contract will be awarded using competitive negotiation." The Solicitation, however, only pertains to one IDIQ contract, albeit with multiple awards and task orders. In addition, Tyler cites 10 U.S.C. § 2305a(b) and 48 C.F.R. § 36.301(b)(1), which limit the two stage procedure to

[6] The Corps also plans to develop a "detailed Independent Government Estimate (IGE) … for each project upon finalization of the Scope of Work," and the Corps "will use the IGE to determine price reasonableness" when issuing task orders. AR 15, pp. 19-20. The Corps "will require contractors to submit cost information in a specific format to match the format of the" IGE "to appropriately analyze the proposed costs on individual task orders." Id. Prices for the initial project "will help determine price reasonableness for all future" projects, and "[a]uditors will be used extensively whenever needed to assure optimum costing." Id.



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

situations when the agency anticipates "three or more offers," and argues that these provisions somehow preclude the agency from making fewer than three awards. Pl. Br. 34. Tyler's argument mixes apples and oranges; an "offer" is not synonymous with an "award." See 48 C.F.R. § 2.101(b).

## IV. TYLER IS NOT ENTITLED TO INJUNCTIVE OR DECLARATORY RELIEF

Tyler has requested permanent injunctive relief. "Courts, however, should interfere with the government procurement process 'only in extremely limited circumstances.'" Avtel Servs., Inc. v. United States, 70 Fed. Cl. 173, 226 (2005) (quoting Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 380 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004). An "injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" OAO Corp. v. United States, 49 Fed. Cl. 478, 480 (2001) (quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2948 (1995)); accord Avtel, 70 Fed. Cl. at 226 ("Because injunctive relief is extraordinary in nature, a plaintiff must demonstrate the right to such relief by clear and convincing evidence.") (collecting cases).

"Confirming the difficult nature of obtaining injunctive relief in a bid protest case, the United States Court of Appeals for the Federal Circuit has stated that even if a trial court finds that the government's actions in soliciting and awarding a contract were arbitrary, capricious, or not in accordance with law, the trial court retains discretion on whether to issue an injunction." Avtel, 70 Fed. Cl. at 226 (citing PGBA, LLC v. United States, 389 F.3d 1219, 1225-26 (Fed. Cir. 2004)). "In addition, a movant is confronted by a more substantial burden of proof when it seeks injunctive relief which would interfere with and infringe upon governmental operations if granted." Avtel, 70 Fed. Cl. at 226 (citing Yakus v. United States, 321 U.S. 414, 440 (1940)).



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**

"In deciding whether a permanent injunction should issue, a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." PGBA, 389 F.3d at 1228-29 (citing Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987)); KSEND v. United States, 69 Fed. Cl. 103, 113 (2005). "The test for a permanent injunction is almost identical to that for a temporary restraining order or preliminary injunction, but rather than the likelihood of success on the merits, a permanent injunction requires actual success on the merits." KSEND, 69 Fed. Cl. at 113 (citation omitted).

Tyler requests "a declaratory judgment that the procurement of these facilities violates" the law. Compl. at 9; see also Pl. Br. 56. When, as in this case, a protestor seeks a declaration that a procurement is unlawful, the request for declaratory relief is "tantamount to a request for injunctive relief" and it should be treated as such. PGBA, 389 F.3d at 1228.

Tyler cannot succeed on the merits. The Corps followed all pertinent laws and did not abuse its discretion in connection with the Solicitation. Tyler's claim that the FAR treats large construction projects differently from small construction projects, and precludes the use of an IDIQ contract in the Solicitation, is wrong as a matter of law. The Corps properly exercised its discretion to utilize the IDIQ contract method to satisfy the Army's barracks requirements and mission objectives. The Corps' exercise of its discretion was informed by years of market research and analysis. The Corps developed a thoughtful plan to strike a balance between economies of scale, cost savings, faster acquisition times, competition, and small business policies. Tyler disagrees with the balance struck by the Corps, but that is not enough. Tyler



**Protected Information To Be Disclosed Only In Accordance
With U.S. Court Of Federal Claims Protective Order**

must demonstrate that the Solicitation lacks a rational basis. The administrative record conclusively proves otherwise.

Tyler's fundamental difficulty is the Competitiveness Demonstration Program that was passed by Congress. Tyler cannot compete for billions of small business set-aside dollars that are being awarded pursuant to the MILCON program, not because of any action taken by the Corps in relation to the Solicitation, but rather, because the Competitiveness Demonstration Program preferences small businesses that are owned by disadvantaged socioeconomic groups. Tyler, therefore, will not suffer irreparable harm if the Corps proceeds with this barracks procurement.

Finally, any harm that Tyler alleges is outweighed by the overriding interest of the Government and the public in providing housing to our Nation's soldiers as they train and as they return from the battlefield. See Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States, 56 Fed. Cl. 502, 521-22 (2003) (granting defendant's motion for judgment because injunction, that could negatively impact the military's ability to construct facilities to house soldiers in wartime, was not in the public interest); CSE Constr. Co. v. United States, 58 Fed. Cl. 230, 262-63 (2003) (concluding that "due regard to the interests of national defense and national security" precluded an injunction barring the construction of firing ranges at Fort Leonard Wood in Missouri, even though the Corps "violated applicable statutes and regulations"); Gentex Corp. v. United States, 58 Fed. Cl. 634, 656 (2003) (denying injunction on national security grounds, even though plaintiff prevailed on the merits, because it would delay the military's ability to get needed equipment). The permanent injunction and declaratory relief sought by Tyler is not justified and would disrupt the Army's tight procurement schedule. See AR 15, pp. 30, 187-88; AR 23, p. 16. Tyler is not entitled to any relief.



**Protected Information To Be Disclosed Only In Accordance**
**With U.S. Court Of Federal Claims Protective Order**

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court grant the United States judgment upon the administrative record, deny plaintiff's cross-motion for judgment on the administrative record, and deny plaintiff's requests for permanent injunctive relief and declaratory relief.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

s/Douglas G. Edelschick
DOUGLAS G. EDELSCHICK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L. Street, N.W.
Washington, DC 20530
Tel: (202) 353-9303

Attorneys for Defendant

OF COUNSEL:

Thomas J. Warren, CPT, JA
Office of the Chief Counsel
United States Army Corps of Engineers
441 G. St. N.W.
Washington, DC 20314

April 25, 2008



**Protected Information To Be Disclosed Only In Accordance**
**With U.S. Court Of Federal Claims Protective Order**

CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2008, a copy of foregoing "DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD AND RESPONSE TO PLAINTIFF'S CROSS-MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Douglas G. Edelschick



**Protected Information To Be Disclosed Only In Accordance With U.S. Court Of Federal Claims Protective Order**