REDACTED VERSION

# In the United States Court of Federal Claims

No. 08-94C
Filed: August 14, 2008

| | | |
|---|---|---|
| | ) | Contracts—Bid Protest: (i) The use of an Indefinite Delivery/Indefinite Quantity contract to acquire construction services constitutes a permissible exercise of the procurement authority under the FAR § 1.102(d); (ii) 15 U.S.C. §§ 631(j), 644; 10 U.S.C. § 2382(a)—Restrictions against bundling of contract requirements, even if applicable to general construction work, do not apply when, on the basis of comprehensive advice provided by the construction industry, the procuring agency determines bundling to be necessary and justified; (iii) 15 U.S.C. § 644 note—The procuring agency is not required to seek a waiver of statutory restrictions barring set-asides for general small business concerns when the agency's needs require participation by contractors that are able to support construction projects generally exceeding small business revenue standards; (iv) 10 U.S.C. § 2305(a)—Statutory two-phase design/build selection procedures are not restricted to acquisitions involving a single structure or group of structures at a single location, nor do they require the award of three or more contracts; (v) FAR §§ 16.504(a)(3), 36.204—The procuring agency did not overstate its needs to the detriment of the ability of small businesses to participate in the solicitation when the regulations barred disclosure of the government price estimate and task orders were identified in terms of minimum and maximum dollar values. |
| TYLER CONSTR. GROUP, | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

Michael H. Payne, Payne Hackenbracht & Sullivan, Ft. Washington, Pennsylvania, attorney of record for plaintiff. Joseph A. Hackenbracht and Timothy A. Sullivan, of counsel.

Douglas G. Edelschick, with whom were Assistant Attorney General Gregory G. Katsas, Director Jeanne E. Davidson, and Assistant Director Reginald T. Blades, Jr., U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, for defendant. Captain Thomas J. Warren, Office of Chief Counsel, United States Army Corps of Engineers, Washington, DC, and Charles L. Webster III, United States Army Corps of Engineers, Fort Worth, Texas, of counsel.

**OPINION**

WIESE, Judge.

Plaintiff, a small-business general contractor, sues here to enjoin the United States Army Corps of Engineers ("the Corps") from proceeding with a negotiated procurement for the award of an Indefinite Delivery/Indefinite Quantity ("IDIQ") contract for the design and construction of various types of military facilities in the southeastern United States. Plaintiff contends that the procurement is unlawful in two fundamental respects: first, because the use of IDIQ procurement procedures for major construction is not permitted by law or regulation, and second, because the solicitation violates a statutory prohibition against consolidating projects that would otherwise be available for competitive award to small business concerns.

The case is now before the court on the parties' cross-motions for judgment on the administrative record. The court heard oral argument on June 25, 2008, and the parties completed supplemental briefing on July 30, 2008. For the reasons set forth below, defendant's motion is granted and plaintiff's cross-motion is denied.

FACTS

On October 30, 2007, the Corps issued Solicitation No. W9126G-07-R-0122, for the design and construction of advanced individual training, basic training, and warrior-in-transition facilities throughout an eight-state region in the southeastern United States. According to the Corps, the solicitation is part of a fundamental change in military construction strategy designed to transform the United States Army into a more modular, expeditionary, and effective fighting force. In this connection, the Corps explained that its primary objective "is to meet the Department of the Army's time, cost, quality, and standardization targets and goals while providing new facilities for our soldiers and their families"—an undertaking

requiring "a minimum of 20% reduction in cost and a minimum of 30% reduction in time to occupancy."

In developing its acquisition strategy, the Corps initiated a market research program in 2005 to acquaint members of the construction industry with the Army's upcoming needs and to gain the industry's perspective on how best to execute a construction program of the magnitude contemplated. The program included sponsorship of a nationwide forum, four regional forums, and a specialized forum with representatives of the pre-fabricated/pre-engineered/modular construction industry, as well as the implementation of an internet-based research questionnaire. Through these efforts, the Corps identified an industry consensus that the successful execution of its construction program would require an emphasis on standardization and economies of scale. Based on this conclusion, the Corps decided to pursue a flexible acquisition strategy "composed of primarily local and regional contracts with a possibility of national contracts, in order to execute an estimated $40 Billion dollar Military Construction . . . Program."

Although the Corps has amended the solicitation numerous times since its issuance (partially in response to litigation initiated by plaintiff), the current version provides for a base-year contract subject to two option years, a minimum guarantee of $10,000 (applicable to the base year only), and a total estimated contract amount of $301 million. The solicitation identifies the scope of work for the initial task order as a "Basic Training (BT) Barracks for Company Operations with running track and training pits" at Fort Benning, Georgia, at an estimated value of between $25 million and $100 million, and contains a 252-page statement of work outlining in detail the other types of facilities to be procured. The statement of work estimates that the Army will require five basic training barracks, one advanced individual training complex (consisting of barracks/company operation facilities, dining facilities, support facilities, and outdoor facilities), and an unspecified number of warrior-in-transition complexes (consisting of barracks, a family assistance center, and an administrative building) throughout the eight-state area. The statement of work does not indicate where these facilities are to be built; it does, however, inform offerors that the facilities will be required primarily at Fort Benning, Georgia.

The solicitation additionally contemplates the selection of two or more contractors based on a two-phase proposal process. In Phase I, the Corps evaluates the performance capabilities of the offerors based on specialized experience, past performance, organization, and technical approach, with up to five offerors "short-listed" and invited to submit Phase II proposals. In Phase II, offerors are asked to submit a conceptual design, technical narrative, performance schedule, and price for the initial task order, with at least two offerors ultimately selected for contract award. The resulting IDIQ contracts allow the selected contractors to become the only competitors for the negotiation and award of all subsequent task orders, subject only

to the limitation that a contractor is not be obligated to honor a task order of less than $14 million, a task order in excess of $47.5 million, or any order involving a combination of items in excess of $95 million.

As noted above, plaintiff challenges the instant procurement on the grounds that the use of IDIQ procurement procedures for major construction is not permitted by law or regulation and that the consolidation of separate construction projects suitable for small businesses constitutes "bundling" and is therefore prohibited by statute. Consistent with these contentions, plaintiff asks the court to enter the following relief: (i) a declaratory judgment holding that the Federal Acquisition Regulations ("FAR") do not authorize the use of IDIQ procedures for the acquisition of large design/build military construction projects or for major construction projects generally; (ii) a declaratory judgment holding that the instant solicitation violates the prohibition on bundling as provided by the Small Business Act, 15 U.S.C. § 631(j) (2006), and therefore impermissibly restricts participation by small business concerns; and (iii) an order permanently enjoining the Corps from awarding a contract under the instant solicitation and directing that the Corps may proceed with the procurement of the facilities identified in the solicitation only through individual project solicitations that provide appropriate opportunities for participation by small business concerns.

DISCUSSION

Pursuant to 28 U.S.C. § 1491(b)(1) (2000), this court has jurisdiction to award declaratory and injunctive relief in "an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement." The statute additionally directs that "[i]n any action under this subsection, the court[] shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"( i.e., the standards set forth in the Administrative Procedure Act). 28 U.S.C. § 1491(b)(4)). Accordingly, in addressing the issues plaintiff raises here, we must determine whether the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2006); Banknote Corp. of America, Inc. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). The burden of proof for these issues lies with plaintiff. Weeks Marine, Inc. v. United States, 79 Fed. Cl. 22, 28 (2007).

Plaintiff's case breaks down into four distinct but related arguments. Plaintiff asserts first that the use of an IDIQ contract to procure construction services is not authorized by the FAR and is thus an impermissible exercise of the FAR's IDIQ authority, FAR Subpart 16.5 (48 C.F.R.). Second, plaintiff maintains that the

solicitation improperly consolidates projects appropriate for general small business concerns, effectively foreclosing their participation in the procurement in violation of the Small Business Act, 15 U.S.C. § 631(j). Third, plaintiff contends that given this result, the Corps should have sought a waiver allowing it to set aside a portion of the contract for small businesses not already the subject of statutory preferences and that its failure to do so was an abuse of discretion. Finally, plaintiff argues that the solicitation does not satisfy a number of the statutory and regulatory requirements applicable to design/build contracts. We address these arguments in turn below.

A.

Central to plaintiff's case is its argument that IDIQ contracts may not be used for the acquisition of major construction projects. Plaintiff observes that IDIQ contracts have historically been used for the procurement of essentially identical "supplies or services" for which there is a recurring need at a single installation or within a small geographic area. The construction of various large-scale military projects over an eight-state region, plaintiff contends, simply does not qualify.

In support of this view, plaintiff refers us to FAR § 16.501-2(a), which identifies an IDIQ contract as a contract used "to acquire supplies and/or services when the exact times and/or exact quantities of future deliveries are not known at the time of contract award." Plaintiff acknowledges that FAR § 16.501-2 does not identify the "supplies" or "services" that may be acquired under an IDIQ contract, but contends that numerous other provisions of the FAR make clear that "construction" is distinct from "supplies or services." FAR § 36.101(c), for example, the section specifically relating to construction contracts, provides that "[a] contract for both construction and supplies or services shall include (1) clauses applicable to the predominant part of the work . . . or (2) if the contract is divided into parts, the clauses applicable to each portion." Plaintiff argues that such a distinction between "construction" and "supplies or services" would be unnecessary if the phrase "supplies or services" included construction.

Similarly, plaintiff notes that FAR Pt. 37, the section dealing with service contracting, defines the term "service contract" as "a contract that directly engages the time and effort of a contractor whose primary purpose is to perform an identifiable task rather than to furnish an end item of supply." FAR § 37.101. The regulation goes on to provide a list of some of the activities that may be performed through service contracts but does not include construction among them. According to plaintiff, then, the FAR recognizes construction as a procurement category distinct from supplies and services and identifies an IDIQ contract as appropriate for procuring only the latter.

Nor, in plaintiff's view, can the present solicitation be construed as seeking supplies or services. Plaintiff points out that the procurement is not for a quantity of buildings (the solicitation only specifically identifies the first task order—the construction of a single basic training barracks) and does not intend the price offered for the first task order to apply to future barracks projects, much less to the other projects identified in the solicitation. Indeed, plaintiff argues that the solicitation fails to comply with FAR § 16.504(a)(4), the regulation identifying the requirements that must be included in an IDIQ solicitation and contract, by failing to specify a "minimum and maximum quantity of supplies or services the Government will acquire under the contract" and "a statement of work, specifications, or other description, that reasonably describes the general scope, nature, complexity, and purpose of the supplies or services the Government will acquire under the contract."[1] In plaintiff's view, then, the contract contemplated here is totally foreign in concept to the traditional use of an IDIQ contract.

Defendant responds that plaintiff's basic premise—that the use of an IDIQ contract to acquire construction services is unlawful absent explicit legal authorization—ignores a fundamental tenet of the procurement regulations, namely, that in meeting the government's needs, a procuring activity is free to use innovative strategies, even though not specifically addressed in the FAR, so long as such strategies are not otherwise prohibited by law. FAR § 1.102(d) sets forth this principle as follows:

> In exercising initiative, Government members of the Acquisition Team may assume if a specific strategy, practice, policy or procedure is in the best interests of the Government and is not addressed in the

---

[1] FAR § 16.504(a)(4) reads in relevant part, as follows:

A solicitation and contract for an indefinite quantity must—

   (i) Specify the period of the contract, including the number of options and the period for which the Government may extend the contract under each option;

   (ii) Specify the total minimum and maximum quantity of supplies or services the Government will acquire under the contract;

   (iii) Include a statement of work, specifications, or other description, that reasonably describes the general scope, nature, complexity, and purpose of the supplies or services the Government will acquire under the contract in a manner that will enable a prospective offeror to decide whether to submit an offer . . . .

>     FAR nor prohibited by law (statute or case law), Executive order or
>     other regulation, that the strategy, practice, policy or procedure is a
>     permissible exercise of authority.

According to defendant, then, the real issue is not whether the use of an IDIQ contract to procure construction services is expressly authorized by the FAR, but whether such use is prohibited by law. And the answer to that question, asserts defendant, is no. Indeed, defendant maintains that rather than prohibiting the use of IDIQ contracts in the acquisition of construction services, the existing FAR structure may in fact be read explicitly to permit it.

In support of this view, defendant notes that FAR § 2.101(b)(2) defines the term "acquisition" as "the acquiring . . . of supplies or services (including construction) . . . whether the supplies or services are already in existence or must be created, developed, demonstrated, and evaluated." That section goes on to define "construction" as the "construction . . . of buildings, structures, or other real property." Finally, FAR § 16.500 describes the "types of contracts that may be used in acquisitions" including "indefinite-delivery contracts." Defendant argues that these regulations, taken together, provide authority for the use of "indefinite-delivery contracts" in "acquisitions" for the "construction . . . of buildings" that must be "created" or "developed." In short, defendant maintains that the Corps' solicitation represents a permissible exercise of the agency's authority.

Defendant additionally notes that while FAR § 36.101(c) indeed appears to distinguish between "construction" and "supplies or services" (referring to "[a] contract for both construction and supplies or services"), plaintiff's inference that the phrase "supplies or services" does not therefore include construction is undercut by the multiple references in the FAR containing such phrasing as "supplies and services (except construction)" (FAR § 19.202-1), "services (except construction)" (FAR §§ 52.219-3, 52.219-4, 52.219-14, 52.219-27, 52.226-5), and "supplies or services other than construction" (FAR § 42.1102). Under plaintiff's reasoning, defendant argues, such references indicate that the phrase "supplies or services" should be interpreted as including construction unless the limitation "except construction" is included. Defendant thus contends that plaintiff's argument does not resolve the problem at hand, but merely sets the stage for competing inferences that can provide no meaningful guidance. Defendant therefore urges the court to rely on the express terms defined in FAR Pt. 2 and used in FAR Pt. 16, authorizing the use of IDIQ contracts for the construction of buildings.

Nor does defendant agree with plaintiff's assertion that the solicitation fails to satisfy the requisite elements of an IDIQ contract as set forth in FAR § 16.504(a)(4)(ii), (iii). Defendant maintains that the identification of the quantity limits mandated by that section may, under FAR § 16.504(a), be stated "as number

of units or as dollar values," a requirement defendant contends is satisfied by the solicitation's inclusion of a minimum contract dollar value ($10,000), a maximum contract dollar value ($301 million), and a dollar value for a typical task order ($31.25 million).  Similarly, defendant argues that the solicitation's 252-page statement of work identifying the facilities to be acquired satisfies FAR § 16.504(a)(4)(iii)'s requirement of providing "a statement of work . . . that reasonably describes the general scope" of the project.

Defendant, we conclude, is correct on all counts.  We are aware of no law, statute, or regulation that prohibits the use of an IDIQ contract for the procurement of construction services, and the various provisions of the FAR offer little insight into whether "construction" is included in or excluded from "supplies or services."  We must therefore conclude that FAR § 1.102(d)—providing procurement officials with the authority to use innovative approaches to satisfy the government's procurement needs so long as such approaches are not otherwise addressed in the FAR or prohibited by law—governs the instant procurement.  We find that the solicitation represents the sort of innovation envisioned by that section and, with its identification of both a contract dollar value and a general scope of work, constitutes a permissible exercise of IDIQ contracting authority.

The legitimacy of the approach the Corps has adopted here is reinforced by 10 U.S.C. § 2304a (2006), the statute codifying the government's IDIQ contracting authority, enacted as part of the Federal Acquisition Streamlining Act of 1994, Pub. L. No. 103-355, §§ 1004, 1054, 108 Stat. 3243, 3249–54, 3261–65.  Section (a) of the statute sets forth the basic authority to award an IDIQ contract as follows: "[T]he head of an agency may enter into a task or delivery order contract . . . for procurement of services or property."  If plaintiff were correct that construction falls outside the scope of IDIQ contracting authority, then the phrase "services or property" would necessarily exclude construction.  The difficulty with this interpretation, however, is that the phrase "services or property" also occurs in the immediately preceding statute, 10 U.S.C. § 2304(a)(1), which directs that "the head of an agency in conducting a procurement for property or services . . . shall obtain full and open competition through the use of competitive procedures."  Plaintiff's argument, then, not only would exempt construction from the general grant of IDIQ contracting authority, but also would remove it from the statutory requirement of full and open competition.  Such an interpretation cannot stand:  competition is the bedrock principle of procurement law.  In sum, then, we hold that the Corps' use of an IDIQ contract to acquire construction services was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

B.

Having concluded that the solicitation makes permissible use of IDIQ procurement procedures, we turn next to plaintiff's second argument—that the scope of the solicitation, as measured by both its dollar amount and the geographic distribution of its construction work, is of a magnitude that impermissibly forecloses small business participation.[2] This argument draws upon the requirements of two essentially similar statutes: the Small Business Act, 15 U.S.C. §§ 631(j), 644, and 10 U.S.C. § 2382(a) (2006), each of which addresses the importance of safeguarding the opportunity for small businesses to participate in government procurements and the need to confine the use of contracts that involve so-called bundling or consolidation of requirements to instances in which the benefits of such an acquisition strategy "substantially exceed" alternative contracting approaches. Specifically, 15 U.S.C. § 631(j), titled "Contract bundling," provides:

> In complying with the statement of congressional policy expressed in subsection (a) of this section, relating to fostering the participation of small business concerns in the contracting opportunities of the Government, each Federal agency, to the maximum extent practicable, shall—
>
> (1) comply with congressional intent to foster the participation of small business concerns as prime contractors, subcontractors, and suppliers;
>
> (2) structure its contracting requirements to facilitate competition by and among small business concerns, taking all reasonable steps to eliminate obstacles to their participation; and

---

[2] Plaintiff maintains that while a small business operating without the benefit of a set-aside is able to compete successfully within targeted geographic regions close to its place of business, such a business cannot possibly submit an offer as a prime contractor for $300 million worth of work in an eight-state region over a three-year period under the current, consolidated solicitation. Indeed, plaintiff argues that only the largest construction companies in the United States have the resources to set up shop temporarily in a multitude of remote locations.

>    (3) avoid unnecessary and unjustified bundling
> of contract requirements that precludes small business
> participation in procurements as prime contractors.[3]

In plaintiff's view, the Corps' use of a single procurement to acquire the design and construction of multiple facilities, many of which would have been suitable for small-business contractors, constitutes the improper bundling the statute prohibits and should be enjoined on that ground.

Defendant, for its part, argues that the bundling statutes, by their terms, apply only to contracts that consolidate existing requirements (i.e., requirements previously provided under separate, smaller contracts) and not to contracts for new requirements, and therefore do not reach the current solicitation. In the alternative, defendant argues that even if the bundling statutes were found to apply to new construction, the Corps has made the requisite showing to exempt the instant procurement from the bundling provisions.

In support of its first point, defendant refers us to 15 U.S.C. § 632(o)(2) (2006), which defines the "bundling of contract requirements" as "consolidating 2 or more procurement requirements for goods or services previously provided or performed under separate smaller contracts into a solicitation . . . for a single contract that is likely to be unsuitable for award to a small-business concern."[4] Because, in

---

[3] 10 U.S.C. § 2382(a) similarly provides:

> The Secretary of Defense shall require the Secretary of each military department, the head of each Defense Agency, and the head of each Department of Defense Field Activity to ensure that the decisions made by that official regarding consolidation of contract requirements of the department, agency, or field activity, as the case may be, are made with a view to providing small business concerns with appropriate opportunities to participate in Department of Defense procurements as prime contractors and appropriate opportunities to participate in such procurements as subcontractors.

[4] 10 U.S.C. § 2382(c)(1) similarly provides:

> The terms "consolidation of contract requirements" and "consolidation" . . . mean a use of a solicitation to obtain offers for a single contract or a multiple award contract to satisfy two or more requirements . . . for goods or services that have previously been provided . . . under two or more separate contracts smaller in cost
> 
> (continued...)

defendant's view, a contract to design and construct a building is a new requirement rather than an existing one, defendant maintains that the bundling statutes simply do not apply. Defendant additionally notes that the Small Business Administration—the agency charged with the protection of small business concerns—has defined a "new requirement" in its regulations as "one which has not been previously procured by the relevant procuring activity," 13 C.F.R. § 124.504(c)(1)(ii), and has specifically found that "[c]onstruction contracts, by their very nature (e.g., the building of a specific structure), are deemed new requirements," 13 C.F.R. § 124.504(c)(1)(ii)(B). Finally, defendant observes that the United States House of Representatives passed the Small Business Fairness in Contracting Act, H.R. 1873, 110th Cong. (2007), on May 11, 2007, a bill that would expand the definition of bundling in 15 U.S.C. § 632(o)(2) to include the consolidation of "requirements for construction services of a type historically performed under separate smaller contracts." H.R. 1873 § 101.[5] Defendant maintains that there would be no need for the House of Representatives to pass H.R. 1873 if the bundling statutes already applied to contracts for new building construction.

Even if the court were to determine that the bundling statutes do in fact apply to new construction, however, defendant argues that the instant solicitation is nevertheless exempted from the bundling prohibition since the Corps reasonably found that the consolidation of its requirements was "necessary and justified" under 15 U.S.C. § 644(e)(2)(A). That statute provides in relevant part:

> Before proceeding with an acquisition strategy that could lead to a contract containing consolidated procurement requirements, the head of an agency shall conduct market research to determine whether consolidation of the requirements is necessary and justified. [6]

---

[4](...continued)
. . . .

[5] According to the House report, this change in the law would "add[] construction services to those contracts that are subject to a bundling analysis mandated by [15 U.S.C. § 644(e)] of the Small Business Act." H.R. Rep. No. 110-111, pt. 1, at 6–7 (2007). The report explained this change as follows: "Under the current definition, a contract may only be considered bundled if it has been previously performed. This provision expands the definition to include construction and other new work." Id. at 15. The bill is now pending before the Senate.

[6] 10 U.S.C. § 2382(b)(1) similarly provides:

> A [Department of Defense] official . . . may not execute an acquisi-
> (continued...)

11

The statute goes on to provide that consolidation may be determined "necessary and justified" if the government would derive "measurably substantial benefits" including cost savings, quality improvements, reduction in acquisition cycle times, and better terms and conditions. 15 U.S.C. § 644(e)(2)(B).[7] Defendant argues that when assessed in these terms, the Corps' consolidation of requirements in the solicitation was "necessary and justified" and therefore permissible.

      In support of this contention, defendant points out that the Corps' decision to consolidate its construction requirements on a regional basis was driven primarily by the construction industry's consensus that successful completion of the Army's construction program would require the Corps to forsake its traditional method of acquisition—individual projects built one at a time and managed by the Corps on an individual district basis—in favor of a standardized approach to contract administration and contractor performance. The industry emphasized that the Army's goals—reduced construction costs and shortened performance schedules—demanded improvements in labor productivity, product quality, and material costs that a contractor could expect to achieve only through repetitive work, i.e., through the repeated construction of the same facility type using the same standard design.

      The Corps accordingly entered a "Determination and Findings for Consolidation" on September 28, 2007, concluding, on the basis of discussions with

---

[6](...continued)
tion strategy that includes a consolidation of contract requirements . . . in excess of $5,000,000, unless the senior procurement executive concerned first—

    (A) conducts market research;

    (B) identifies any alternative contracting approaches that would involve a lesser degree of consolidation of contract requirements; and

    (C) determines that the consolidation is necessary and justified.

[7] 10 U.S.C. § 2382(b)(2), (3) similarly goes on to define consolidation as "necessary and justified" if "the benefits of the acquisition strategy substantially exceed the benefits of each of the possible alternative contracting approaches," and specifies that the possible benefits "may include cost and, regardless of whether quantifiable in dollar amounts—(A) quality; (B) acquisition cycle; (C) terms and conditions; and (D) any other benefit."

the construction industry, that a major change in its acquisition strategy was required. Specifically, the Corps found that "the standard project-specific solicitation and contracting method . . . is most feasible when time, resource and cost constraints are not primary factors in the approach consideration," but noted that to accommodate the projected increase in construction activity (identified in the findings as "a doubling of the workload with no increase in government personnel"), "a degree of consolidation is clearly required."  The Corps went on to explain:

> Because of the magnitude of the new construction that will occur under this program, [the Corps] determined that significant savings can be realized by taking advantage of the economies of scale that will result from bulk purchase of materials and equipment, as well as labor savings by having one contractor constructing the same facility type over and over within the same region . . . . [The Corps] subsequently identified specific facility types for which designs will be standardized and procured on product line basis.
>
> [The Corps] has determined that contracts based on a facility type approach is the best way to achieve cost and time savings and ensure successful mission execution.  In its evaluation, [the Corps], in concert with the information obtained from the national industry forums, used a minimum of three facilities to be built as the optimum for achieving economy of scale benefits.  Contracts awarded on a facility type basis will allow [the Corps] to reap the benefits which accrue to the Government and the Contractor through a continuous build program similar to the way private industry conducts business.

In addition, the Corps identified the following benefits expected to result from a continuous build program:  (i) a reduction in project award time; (ii) an elimination of subsequent facility design costs; (iii) an increased stability of the labor pool; (iv) a gain in labor efficiency resulting in a reduction in construction time and corresponding improvement in product quality; (v) a reduction in material costs; and (vi) an improvement in the working relationships between the government and the contractor.  Defendant argues that the identification of such benefits more than satisfies the requirement in 15 U.S.C. § 644(e)(2)(A) that the agency "conduct market research to determine whether consolidation of the requirements is necessary and justified," particularly when the Corps based its conclusions on extensive market research and industry consensus.

Plaintiff maintains, however, that the alleged benefits of consolidation are either insignificant or illusory.  As an example, plaintiff notes that the reduction in lead time prior to project award identified in the record actually involves no more than 45 days—a time savings that plaintiff contends cannot conceivably justify the

consolidation of the agency's needs to the exclusion of small-business participation. Similarly, plaintiff observes that the elimination of costs associated with repetitive design would be achievable even in the absence of consolidation simply by making the initial design available to other contractors who could then complete the design for a specific site and construct the facility on a project-by-project basis.

Perhaps most significantly, however, plaintiff argues that the assumption that a contractor will enjoy a continuous flow of work and thereby garner the benefits expected to result from such repetition (e.g., stability of its labor pool, gain in labor efficiency, enhancements in product quality, and reduction in material costs) largely ignores the fact that there is nothing in the solicitation itself that offers any assurance of continuous work. Indeed, plaintiff points out that since the Corps reserved the right to award the initial task order as a stand-alone contract with the remaining capacity advertised later in a full and open competition, or to issue other solicitations for similar work in the same region, a contractor would have no reasonable expectation that it would receive even one project, let alone continuous follow-on work. At base, then, plaintiff maintains that the Corps has failed to establish that the consolidation of the construction projects identified in the solicitation were "necessary and justified," hence rendering the solicitation unlawful as a matter of law.

Whether the bundling provisions of 15 U.S.C. § 631(j) should or do apply to acquisitions for new construction is a question we leave to Congress. To resolve the matter at hand, it is enough for us to conclude, assuming (without deciding) that the provisions do in fact apply, that the Corps has demonstrated that the consolidation of the contract requirements was necessary and justified within the meaning of the relevant statutes. As defendant makes clear, the Corps' choice of acquisition strategy was dictated by an industry consensus that successfully meeting the Army's goals in construction costs and time would require a departure from the Corps' traditional "one project at a time" approach in favor of an acquisition strategy that maximized economies of scale. Given the Corps' extensive market research and its detailed analysis of the issue, we can find no fault with the Corps' decision to rely on the industry's counsel.

Nor do we accept plaintiff's contention that the Corps' rationale for adopting a consolidated acquisition strategy—the benefits achieved through continuous work by an individual contractor—is largely illusory. As defendant explains, the Corps intends to award task orders on a sequenced, single-project basis (i.e., one task order for each barracks project) to promote price competition while reserving the right to order multiple projects using a single task order subject to the solicitation's "Order Limitations" clause. By proceeding in this manner, the Corps anticipates that two or three contractors will perform the work required to construct nine facilities, with each contractor performing three or more projects, thereby realizing the anticipated

economics of scale. Given this explanation, we see no reason to conclude that the Corps was not rational in determining that a consolidation of the contract requirements was necessary and justified.

C.

Despite our finding that the Corps' decision to consolidate the contract requirements was rational, however, plaintiff argues that it was nevertheless incumbent on the Corps, given the consolidation's stifling effect on participation in the procurement by small businesses, to set aside a portion of the project for small businesses not otherwise subject to statutory preferences.[8] Although plaintiff acknowledges that such a set-aside would not ordinarily be permitted under the Small Business Competitiveness Demonstration Program Act of 1988, 15 U.S.C. § 644 note;[9] plaintiff observes that in a June 2, 2008, memorandum, the Department of Defense concluded that during the 12-month period ending on September 30, 2007, the Department of the Army had attained less than a 35 percent small business participation rate in the "Construction of Buildings" subsector and, based on that finding, directed that "all subsequent contracting opportunities in excess of the amount reserved for emerging small businesses . . . shall be solicited through competition restricted to eligible small businesses." In light of this memorandum, plaintiff contends that it was an abuse of discretion for the Corps not to seek a waiver of the prohibitions against small business set-asides and that its failure to do so unlawfully denied plaintiff an opportunity to compete.

---

[8] Approximately 20 percent of the solicitation was set aside for socially and economically disadvantaged businesses, i.e., small business concerns entitled to competition-restricted preferences under 15 U.S.C. § 637(a)(1) (the "Section 8(a) Program"); 15 U.S.C. § 657a (the "HUBZone Program"); and 15 U.S.C. §657f (the "Service-Disabled, Veteran-Owned Small Business Procurement Program").

[9] As explained in the Act's introductory findings, traditional efforts to implement the mandate for small business participation in federal procurements have resulted in an over-concentration of small business participation in a limited number of industry categories, while at the same time failing to expand small business participation in certain other categories. 15 U.S.C. § 644 note, § 702(3)(A), (B). FAR § 19.1007(b), the regulation implementing the Act, thus prohibits solicitations in certain designated contract categories from being subject to small business set-asides, except for those set-asides mandated for socially and economically disadvantaged small businesses. 15 U.S.C. § 644 note, §§ 713(a), 717(a), (b), 718(a). Plaintiff is a small business concern whose industry classification (commercial and institutional building construction) is among those designated industry groups for which non-preferential set-asides were prohibited as of the date of the solicitation.

15

By the memorandum's terms, however, the reinstatement of the set-aside program is prospective only—directed to "subsequent contracting opportunities"—and thus has no effect on the instant procurement, first issued on October 30, 2007. Until the issuance of this directive, the Corps was bound to honor the restriction against small business set-asides required under the Small Business Competitiveness Demonstration Program. As discussed above, the Corps set aside a portion of the project to certain statutorily preferred small businesses and decided, based on industry consensus, that it was necessary and justified in consolidating the remaining aspects of the procurement. Beyond that necessary and justified finding, the Corps had no obligation to seek a waiver—and thereby implement a set-aside program—that would have been contrary to its needs. We are therefore unable to conclude that the Corps in any way abused its discretion.

D.

Plaintiff's final challenge to the procurement—that the solicitation illegally deviates in a number of key respects from the statutory and regulatory requirements applicable to design/build contracts—is equally unavailing. Plaintiff maintains that the governing statute, 10 U.S.C. § 2305a (2006), which authorizes the use of a two-phase selection procedure (i.e., a design/build procedure) when "entering into a contract for the design and construction of a public building, facility, or work," only anticipates the construction of a single structure or group of structures at one location rather than some indefinite quantity of buildings and facilities throughout an eight-state region. In addition, plaintiff notes that the statute restricts the use of a two-phase solicitation procedure to those situations in which "the contracting officer anticipates that three or more offers will be received for such contract." 15 U.S.C. § 2305a(b). Plaintiff maintains that the Corps' intention to award two multiple-award contracts does not comply with this requirement.

Plaintiff's interpretation of 10 U.S.C. § 2305a, however, contravenes a basic canon of statutory construction: that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise—words importing the singular include and apply to several persons, parties, or things . . . ." 1 U.S.C. § 1 (2006). We thus see no reason to limit 10 U.S.C. § 2305a's reference to the "construction of a public building, facility, or work" to a single building or group of buildings at a single site. Similarly, the Corps' plan to make two contract <u>awards</u> does not violate the requirement in 10 U.S.C. § 2035a(b) that design/build contracts be used only where "the contracting officer anticipates that three or more offers will be received for such contract"; an "offer," as defendant points out, is not synonymous with an award. Thus, the Corps' intention to make fewer than three contract awards does not run afoul of 10 U.S.C. § 2305a(b).

16

E.

One final issue remains for resolution.  The question arose at oral argument whether, given the structure of the solicitation, plaintiff reasonably concluded that the Corps' requirements demanded a level of performance beyond plaintiff's capacity to provide.  Defendant maintains that the answer is no.  Specifically, defendant points out that the solicitation identifies the "[t]ypical construction value" as $31.25 million, a figure defendant interprets as representing the anticipated value of a task order and hence an amount within plaintiff's financial capacity to perform.

Plaintiff rejects this interpretation.  In plaintiff's view, the phrase "typical construction value" refers to the dollar amount used in Phase I of the solicitation to identify the minimum project value an offeror is required to submit as evidence of qualifying past performance, rather than to the likely amount of any future task order.  Indeed, plaintiff contends that the only guidance offerors were given regarding the potential price range for future task orders was the solicitation's description of the initial task order (providing that "[t]he construction magnitude for the initial task will be $25 million to $100 million") and the solicitation's "Order Limitations" clause (providing that the contractor is not obligated to honor a task order of less than $14 million or more than $47.5 million or any order involving a combination of items in excess of $95 million.)  Based on these numbers, plaintiff asserts that it reasonably concluded that future task orders would likely be of a magnitude beyond plaintiff's bonding capacity and that plaintiff was consequently dissuaded from bidding on the contract.

Plaintiff goes on to say, however, that the stated numbers were in fact misleading.  Plaintiff points out that while the solicitation describes an eight-state region for the performance of work and a single project task order up to $47.5 million, the Corps' internal documents show a planned procurement of only nine projects in two states and, more importantly, an estimated cost for **[REDACTED]** those projects ranging from $16 million to **[REDACTED]**.  Plaintiff insists that had this information been disclosed, it would have participated as a bidder in the solicitation.  Plaintiff thus contends that the instant procurement amounts to a set-aside for large businesses implemented through an exaggerated statement of the Corps' actual needs.

While we agree with plaintiff that the solicitation's use of the phrase "typical construction value" (and its associated dollar amount of $31.25 million) refers only to the evaluation of past construction experience and not to the dollar amount a contractor could expect to encounter in a typical task order, we cannot accept plaintiff's contention that the dollar amounts set out in the solicitation for the initial task order (between $25 million and $100 million) and for subsequent task orders (between $14 million and $47.5 million for a single item and $95 million for a

17

combination of items) represent an exaggeration of the Corps' needs.  As defendant explains in its supplemental brief, FAR § 36.204 ("Disclosure of the magnitude of construction projects") directs that a solicitation must state the magnitude of the requirement in terms of an estimated price range but specifies that "[i]n no event shall the statement of magnitude disclose the Government estimate."  Additionally, FAR § 16.504(a)(3) ("Indefinite-quantity contracts") provides that "[t]he contract may . . . specify maximum or minimum quantities that the Government may order under each task . . . order."   Defendant points out that the $25 million to $100 million price range for the initial task order identified in the solicitation was in accordance with the price range criteria called out in FAR § 36.204 (based on the Corps' own estimate of **[REDACTED]**) and the price range for any subsequent project was correctly identified as $14 million to $47.5 million (based on the Corps' estimate of $16 million to $43 million).  Thus, the dollar values identified in the solicitation for the initial task order and for subsequent task orders set forth the range of values the Corps lawfully could disclose, while at the same time preserving the confidentiality of its own internal estimates.

CONCLUSION

For the reasons set forth above, defendant's motion for judgment on the administrative record is granted and plaintiff's cross-motion is denied. Accordingly, the Clerk shall enter judgment dismissing the complaint.

                                                  s/John P. Wiese
                                                 John P. Wiese
                                                 Judge